# United States Court of Appeals for the Fourth Circuit

UNITED STATES OF AMERICA

*Plaintiff/Appellee,*

v.

JACKY MCCOMBER

*Defendant/Appellant*

Appeal from the United States District Court for the
District of Maryland, No. 21-cr-00036-ELH

## APPELLANT'S OPENING BRIEF

Paresh S. Patel
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
Paresh_Patel@fd.org

Andrew S. Tulumello
Crystal L. Weeks
Laurel L. Zigerelli
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7516
Drew.Tulumello@weil.com
Crystal.Weeks@weil.com
Laurel.Zigerelli@weil.com

Alli G. Katzen
Marina Masterson
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Ave., Suite 1200
Miami, FL 33131
(305) 577-3150
Alli.Katzen@weil.com
Marina.Masterson@weil.com

*Counsel for Appellant*

# TABLE OF CONTENTS

Introduction ....................................................................................... 1

Jurisdictional Statement .................................................................... 3

Statement of Issues ........................................................................... 3

Statement of the Case ....................................................................... 4

  I.  Factual Background .................................................................. 4

    A.  The Ironbridge Contract ................................................. 4

    B.  The Role of the PM ........................................................ 6

    C.  McComber's Work as PM ............................................... 7

    D.  Breach of ITK's Timekeeping System ........................... 9

    E.  NSA-OIG's Investigation ............................................... 9

    F.  Statements ..................................................................... 12

  II.  Procedural History .................................................................. 14

    A.  Pre-Trial Proceedings ................................................... 14

    B.  Trial .............................................................................. 15

      1.  Government witnesses ........................................... 15

      2.  Defense witnesses ................................................. 17

    C.  Post-Trial Proceedings .................................................. 18

Summary of the Argument ............................................................... 22

Argument ......................................................................................... 24

  I.  The District Court Abused its Discretion in Admitting the "Summary" Spreadsheet at the Center of the Government's Case ........................................................................................ 24

    A.  Standard of Review ....................................................... 24

    B.  The Spreadsheet Was Inadmissible Under Rules 1006 and 403 .......................................................................... 24

      1.  The spreadsheet did not satisfy Rule 1006 .......... 24

      2.  The spreadsheet should have been excluded under Rule 403 .......................................................... 36

II. The District Court Erred in Denying McComber's Motion for
Judgment of Acquittal ....................................................................... 38

    A.  Standard of Review ..................................................................... 38

    B.  Conviction on Counts 1–19 Was Based On Insufficient
Evidence ...................................................................................... 39

        1.  The government failed to prove that McComber
submitted any materially false invoices ............................... 40

        2.  The government failed to prove that McComber
knowingly submitted any materially false invoices ............ 46

    C.  Conviction on Count 20 was Not Based on Sufficient
Evidence ...................................................................................... 52

        1.  The government failed to prove McComber made a
materially false statement .................................................... 52

        2.  The government failed to prove McComber knowingly
and willfully made a false statement .................................... 54

III. The District Court Committed Plain Error by Erroneously
Instructing the Jury ........................................................................... 55

    A.  Standard of Review ..................................................................... 56

    B.  The District Court Issued a Jury Instruction on Off-Site
Work that Shifted the Burden of Proof to McComber ............. 56

    C.  The District Court's Error Was Plain ....................................... 59

    D.  The Error Affected McComber's Substantial Rights ................. 59

IV. The Government Committed Prejudicial Prosecutorial
Misconduct by Making Burden-Shifting Arguments and
Appealing to the Jurors' Pecuniary Interests ................................... 60

    A.  Standard of Review ..................................................................... 61

    B.  The Government Repeatedly Shifted the Burden of Proof to
McComber .................................................................................... 61

    C.  The Government's Burden-Shifting Questions and
Arguments Prejudiced McComber and Deprived Her of a
Fair Trial .................................................................................... 66

D.  The Government Improperly Appealed to the Pecuniary Interest of the Jurors ................................................. 70

E.  The Government's Appeals to Jurors' Pecuniary Interests Prejudiced McComber ............................... 72

F.  The Repeated Instances of Prosecutorial Misconduct Had the Cumulative Effect of Depriving McComber of a Fair Trial ........................................................................ 73

V.  The Court's Restitution Order Must be Reversed Because the NSA Suffered No Pecuniary Loss and the Order is Based on an Arbitrary Loss Determination .......................................... 74

A.  Standard of Review .................................................... 74

B.  The District Court Erred in Refusing to Apply Credits Against Loss .............................................................. 75

C.  The District Court's Loss Calculation was Arbitrary and Unsupported by the Evidence ..................................... 79

D.  The District Court Erred in Calculating the Advisory Guidelines Range ...................................................... 83

Conclusion ............................................................................ 83

Request for Oral Argument ................................................... 84

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beam v. Foltz,*
    832 F.2d 1401 (6th Cir. 1987) ....................................... 69

*United States ex rel. Becker v. Westinghouse Savannah
    River Co.,*
    305 F.3d 284 (4th Cir. 2002) ......................................... 51

*Berger v. United States,*
    295 U.S. 78 (1935) ........................................................ 68

*Bluiett v. Pierre M. Sprey, Inc.,*
    2009 WL 10685350 (D. Md. Jan. 27, 2009) .............. 26, 27

*Bryan v. United States,*
    524 U.S. 184 (1998) ...................................................... 54

*Buttermore v. United States,*
    180 F.2d 853 (6th Cir. 1950) ....................................... 73

*Clark v. Arizona,*
    548 U.S. 735 (2006) ...................................................... 56

*United States ex rel. Durcholz v. FKW, Inc.,*
    189 F.3d 542 (7th Cir. 1999) ....................................... 51

*Eichorn v. AT&T Corp.,*
    484 F.3d 644 (3d Cir. 2007) ........................................ 27

*Evans-Smith v. Taylor,*
    19 F.3d 899 (4th Cir. 1994) ......................................... 39

*Francis v. Franklin,*
    471 U.S. 307 (1985) ...................................................... 56

*Gordon v. United States,*
    438 F.2d 858 (5th Cir. 1971) ....................................... 25

*Leathers v. Gen. Motors Corp.,*
546 F.2d 1083 (4th Cir. 1976) .................................................. 71, 72

*Lockheed Martin IR Imaging Sys., Inc. v. West,*
108 F.3d 319 (Fed. Cir. 1997) .................................................. 50

*Maersk Line, Ltd. v. United States,*
513 F.3d 418 (4th Cir. 2008) .................................................. 50

*Noel v. Artson,*
641 F.3d 580 (4th Cir. 2011) .................................................. 56

*Peat, Inc. v. Vanguard Rsch., Inc.,*
378 F.3d 1154 (11th Cir. 2004) .................................................. 31

*Rosales-Mireles v. United States,*
585 U.S. 129 (2018) .................................................. 83

*Ruan v. United States,*
597 U.S. 450 (2022) .................................................. 46, 47

*Sandstrom v. Montana,*
442 U.S. 510 (1979) .................................................. 59, 69

*United States ex rel. Schutte v. SuperValu Inc.,*
598 U.S. 739 (2023) .................................................. 47, 49, 50

*United States ex rel. Spay v. CVS Caremark Corp.,*
875 F.3d 746 (3d Cir. 2017) .................................................. 51

*United States v. Allen,*
529 F.3d 390 (7th Cir. 2008) .................................................. 76

*United States v. Alvarado,*
840 F.3d 184 (4th Cir. 2016) .................................................. 75, 81

*United States v. Benson,*
957 F.3d 235 (4th Cir. 2020) .................................................. 69

*United States v. Blecker,*
657 F.2d 629 (4th Cir. 1981) .................................................. 70, 72, 73

*United States v. Bolden*,
   325 F.3d 471 (4th Cir. 2003) ................................................ 46, 47, 49

*United States v. Bradley*,
   164 F.3d 626 (4th Cir. 1998) ....................................................... 38

*United States v. Canty*,
   37 F.4th 775 (1st Cir. 2022) ....................................................... 69

*United States v. Catone*,
   769 F.3d 866 (4th Cir. 2014) ...................................................... 79

*United States v. Chujoy*,
   207 F. Supp. 3d 626 (W.D. Va. 2016) .......................................... 44

*United States v. Cole*,
   491 F.2d 1276 (4th Cir. 1974) ................................................ 41, 45

*United States v. Conrad*,
   320 F.3d 851 (8th Cir. 2003) ...................................................... 68

*United States v. Crummy*,
   249 F. Supp. 3d 475 (D.D.C. 2017) ............................................ 76

*United States v. Dominique-McClain*,
   623 F. Supp. 3d 33 (E.D.N.Y. 2022) ........................................... 33

*United States v. Elfenbein*,
   708 F. Supp. 3d 621 (D. Md. 2023) ............................................ 64

*United States v. Ewing*,
   957 F.2d 115 (4th Cir. 1992) ................................................. 39, 47

*United States v. Glymph*,
   96 F.3d 722 (4th Cir. 1996) ........................................................ 49

*United States v. Golding*,
   168 F.3d 700 (4th Cir. 1999) ...................................................... 61

*United States v. Gonzales-Flores*,
   701 F.3d 112 (4th Cir. 2012) ...................................................... 32

*United States v. Grant,*
211 F. App'x 889 (11th Cir. 2006)....................................................80

*United States v. Harris,*
821 F.3d 589 (5th Cir. 2016) ........................................................76

*United States v. Hart,*
295 F.3d 451 (5th Cir. 2002) ....................................................37, 38

*United States v. Hastings,*
134 F.3d 235 (4th Cir. 1998).....................................................56, 59

*United States v. Inusah,*
2024 WL 1156104 (4th Cir. Mar. 18, 2024) ...................................34

*United States v. Irvin,*
682 F.3d 1254 (10th Cir. 2012) .......................................................30

*United States v. Janati,*
374 F.3d 263 (4th Cir. 2004) ....................................................25, 36

*United States v. Lawrence,*
349 F.3d 109 (3rd Cir. 2003)..........................................................33

*United States v. Lewis,*
53 F.3d 29 (4th Cir. 1995).............................................................57

*United States v. Lighty,*
616 F.3d 321 (4th Cir. 2010) .........................................................74

*United States v. Looking,*
156 F.3d 803 (8th Cir. 1998) .........................................................33

*United States v. Markovich,*
95 F.4th 1367 (11th Cir. 2024)......................................................26

*United States v. Martin,*
796 F.3d 1101 (9th Cir. 2015) .......................................................79

*United States v. Martinez,*
277 F.3d 517 (4th Cir. 2002) .........................................................73

*United States v. McIntyre*,
   997 F.2d 687 (10th Cir. 1993) ........................................ 32

*United States v. Molovinsky*,
   688 F.2d 243 (4th Cir. 1982) ......................................... 65

*United States v. Moore*,
   666 F.3d 313 (4th Cir. 2012) ......................................... 74

*United States v. Nelson*,
   774 F.3d 1104 (7th Cir. 2014) ....................................... 81

*United States v. Ocasio*,
   750 F.3d 399 (4th Cir. 2014) ......................................... 75

*United States v. Oros*,
   578 F.3d 703 (7th Cir. 2009) ......................................... 30

*United States v. Palma*,
   473 F.3d 899 (8th Cir. 2007) .................................... 70, 71

*United States v. Parker*,
   903 F.2d 91 (2d Cir. 1990) ....................................... 62, 65

*United States v. Pitt*,
   482 F. App'x 787 (4th Cir. 2012) .................................. 60

*United States v. Powell*,
   469 U.S. 57 (1984) ...................................................... 38

*United States v. Recio*,
   884 F.3d 230 (4th Cir. 2018) ......................................... 30

*United States v. Reid*,
   523 F.3d 310 (4th Cir. 2008) ......................................... 59

*United States v. Ritchie*,
   858 F.3d 201 (4th Cir. 2017) ......................................... 75

*United States v. Ro*,
   465 F. App'x 217 (4th Cir. 2012) .................................. 37

*United States v. Saint Louis,*
    889 F.3d 145 (4th Cir. 2018) .......................................... 61

*United States v. Samad,*
    754 F.2d 1091 (4th Cir. 1984) .................................... 40, 45

*United States v. Savage,*
    885 F.3d 212 (4th Cir. 2018) .......................................... 79

*United States v. Savoie,*
    985 F.2d 612 (1st Cir. 1993) .......................................... 82

*United States v. Scheetz,*
    293 F.3d 175 (4th Cir. 2002) .................................... 67, 68

*United States v. Schimmel,*
    943 F.2d 802 (7th Cir. 1991) .......................................... 70

*United States v. Shealey,*
    641 F.3d 627 (4th Cir. 2011) .......................................... 61

*United States v. Simon,*
    964 F.2d 1082 (11th Cir. 1992) ...................................... 61

*United States v. Smith,*
    451 F.3d 209 (4th Cir. 2006) .................................... 38, 39

*United States v. Smith,*
    500 F.2d 293 (6th Cir. 1974) ............................. 61, 67, 69

*United States v. Smyth,*
    556 F.2d 1179 (5th Cir. 1977) .................................. 70, 72

*United States v. Solivan,*
    937 F.2d 1146 (6th Cir. 1991) ...................................... 67

*United States v. Spalding,*
    894 F.3d 173 (5th Cir. 2018) .......................................... 27

*United States v. Steele,*
    897 F.3d 606 (4th Cir. 2018) .......................................... 80

*United States v. Stockton,*
349 F.3d 755 (4th Cir. 2003) ..................................... 65, 66

*United States v. Stone,*
866 F.3d 219 (4th Cir. 2017) ..................................... 75, 79

*United States v. True,*
179 F.3d 1087 (8th Cir. 1999) ........................................ 62

*United States v. Walker,*
32 F.4th 377 (4th Cir. 2022) ......................................... 24

*United States v. Watkins,*
519 F.2d 294 (D.C. Cir. 1975) ....................................... 32

*United States v. Wein,*
521 F. App'x. 138 (4th Cir. 2013) (per curiam) .............................. 31

*United States v. Wheeler,*
753 F.3d 200 (D.C. Cir. 2014) ....................................... 31

*United States v. Wooden,*
693 F.3d 440 (4th Cir. 2012) ........................................ 79

*In re Winship,*
397 U.S. 358 (1970) ............................................. 39, 59

## Statutes

18 U.S.C. 287 .......................................................*passim*

18 U.S.C. 1001 ......................................................... 1

18 U.S.C. 1001(a)(2) ............................................. 14, 52

18 U.S.C. 3663A(a)(1) .............................................. 75

18 U.S.C. 3663A(c)(1)(A)(ii) ....................................... 75

18 U.S.C. 3663A(c)(3)(B) .......................................... 82

18 U.S.C. 3664(e) .................................................. 79

18 U.S.C. 3742 ....................................................................... 3

28 U.S.C. 1291 ....................................................................... 3

USSG §2B1.1(b)(1)(G) ........................................................ 18

USSG §2B1.1(C)(i) .............................................................. 76

**Rules**

Fed. R. Crim. P. 52(b) ....................................................... 56

Fed. R. Evid. 29 .......................................................... *passim*

Fed. R. Evid. 403 ........................................................ *passim*

Fed. R. Evid. 801(c) ........................................................... 31

Fed. R. Evid. 803(6) ........................................................... 31

Fed. R. Evid. 1006 ...................................................... *passim*

**Other Authorities**

2 McCormick on Evid. § 241 (8th ed. 2022) ........................... 25, 27, 35

11 Wright & Miller, Fed. Prac. & Proc. § 8043 (3d ed. 2022) ........................................................................ 30, 36

*Matter of: Gen. Dynamics Info. Tech., Inc.*, B-421525 (May 26, 2023) ............................................... 78

*Postscript: The Firm-Fixed-Price Level-of-Effort Contract*, 32 Nash & Cibinic Rep. NL ¶ 61 ................................... 5

*The Firm-Fixed-Price Level-of-Effort Contract: A Mystery In An Enigma*, 26 No. 7 Nash & Cibinic Rep. ¶ 35 .......... 5

# INTRODUCTION

Defendant-Appellant Jacky McComber is a devoted mother, sister, daughter, and wife, who—until seven years ago—was also a successful business owner. For nearly 20 years, McComber held one of our nation's highest security clearances from the prestigious National Security Agency ("NSA"). McComber's hard work led to the creation of InfoTek ("ITK"), a contracting company she built from scratch. What began as a modest two-person operation, McComber grew into a thriving multi-million-dollar business with over 90 employees and multiple defense contracts at its peak.

That all came crashing down in 2017 when, amidst a hotly contested divorce and an investigation into a breach of ITK's timekeeping system, NSA received an anonymous whistleblower letter alleging McComber committed timecard fraud during her nineteen-month tenure as Program Manager ("PM") for ITK's "Ironbridge" contract with NSA.

In February 2023, McComber was convicted of nineteen counts of violating the False Claims Act ("FCA"), 18 U.S.C. 287, and one count of knowingly and willfully making a false statement in violation of 18 U.S.C. 1001. The latter was based on statements McComber made during an NSA Office of the Inspector General ("NSA-OIG") interview shortly after NSA received the whistleblower letter.

In many respects, this case defies belief. The district court judge has more than once referred to it as the most contentious case over which she has "ever had the misfortune" of presiding, JA5492, JA5051; the government has at many points bizarrely invested itself in defending the rights of McComber's ex-husband and his friend who unlawfully breached ITK's timekeeping system, JA5337-5338, JA143-144, JA147; and McComber is currently serving prison time for billing practices that were nearly identical to her predecessor on the contract, who not only has *not* been charged with a federal crime, but was held out by the government as a model-employee at trial.

This is also a more complicated case than the government would have the Court believe. This is not a simple FCA timecard fraud case. It is a *government contracts* case involving a frequently misunderstood type of contract that is used only when the work performed cannot be easily defined. McComber believed she was complying with the terms of the Ironbridge contract, including where she could work and what she could do to fill the eight-hour days it required. No evidence exists to the contrary. That fact alone forecloses a fraud conviction.

Even if there were sufficient evidence to sustain a conviction, a number of prejudicial errors require reversal. The government mounted a "trial by charts," basing its case on a purported "summary spreadsheet" that

flouted evidentiary rules. Compounding the harm to McComber, the government used the spreadsheet to create a presumption that McComber was not working on days she was "off-site," shifting the burden to McComber to prove otherwise, in violation of her constitutional rights. Recognizing how misleading the government's case was on the issue of off-site work, the court set out to instruct the jury on the issue, but only made matters worse by further shifting the burden.

McComber's conviction must be reversed. But even if it stands, the restitution order should be reversed and McComber's sentence vacated because NSA suffered no pecuniary loss.

## JURISDICTIONAL STATEMENT

McComber appeals from a judgment entered on July 2, 2024 by the United States District Court for the District of Maryland. JA7149-7156. McComber timely noticed her appeal. JA7157. This Court has jurisdiction under 18 U.S.C. 3742 and 28 U.S.C. 1291.

## STATEMENT OF ISSUES

1. Whether the court erred in permitting the government to use a "summary spreadsheet"—the cornerstone of the government's case—under Federal Rules of Evidence 1006 and 403 because it was inaccurate, misleading, and populated with hearsay.

2.    Whether McComber's convictions were based on sufficient evidence.

3.    Whether the court committed plain error when it instructed the jury about off-site work and shifted the burden of proof to McComber.

4.    Whether the government engaged in prosecutorial misconduct by repeatedly shifting the burden to McComber throughout the trial and appealing to the pecuniary interests of jurors in closing.

5.    Whether the court erred in ordering restitution and sentencing McComber based on an arbitrary loss determination where NSA suffered no pecuniary loss.

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    The Ironbridge Contract

In July 2011, NSA awarded ITK the multi-year Ironbridge contract. JA33. Ironbridge's mission was to "implement state-of-the-art information technology and software requirements" to enable NSA's National Security Operations Center ("NSOC")—NSA's "24/7 Operations Center"—and its Counter Terrorism Mission Management Center ("CTMMC") "to gather, aggregate ... and disseminate mission-critical information." JA4435.

Ironbridge was awarded as a Firm-Fixed-Price Level-of-Effort ("FFP-LOE") contract. FFP-LOE contracts are obscure; indeed, legal commentators have described them as "something of a mystery to many practitioners, who are not sure what this contract is, how it works, or when to use it." *The Firm-Fixed-Price Level-of-Effort Contract: A Mystery In An Enigma*, 26 No. 7 Nash & Cibinic Rep. ¶ 35; *Postscript: The Firm-Fixed-Price Level-of-Effort Contract*, 32 Nash & Cibinic Rep. NL ¶ 61 (discussing confusion over how to interpret FFP-LOE contracts). They require "[t]he Government to pay the contractor a fixed dollar amount" for a specified "level of effort," which is agreed upon up front. FAR 16.207-1(b); JA1257-1259.

Under the regulations, FFP-LOE contracts "may be used only when ... a) The work required cannot otherwise be clearly defined; b) The required level of effort is identified and agreed upon in advance; and c) There is reasonable assurance that the intended result cannot be achieved by expending less than the stipulated effort." FAR 16.207-3.

Consistent with FAR 16.207-3(b), during a pre-award process, NSA determined the level-of-effort needed to perform Ironbridge, broken down by labor categories. FAR 1.701; JA2132-2133. The Contract required ITK to provide a PM to work a fixed number of hours over a fixed period of time. JA1258, JA4370, JA4373. Ironbridge did not require ITK personnel

to keep a log of specific tasks reflecting the work performed, JA4368-4406, but it did require ITK to submit invoices listing the hours expended by each labor category, JA4375-4376. It also required ITK to submit Funds and Man Hours Expenditure Reports ("FMHERs"), which projected, by labor category, the hours ITK planned to bill for each remaining pay period on the Contract. JA375-376, JA1759, JA7178.

On the NSA side, the contracting officer and contracting officer representatives ("CORs") administered the contract. JA314-316. In particular, the CORs were responsible for "observing the performance of the contractor, the invoices[,] [a]ny performance issues," and "monitor[ing] funds." JA315-316. That included inspecting invoices to verify that the "number of hours provided by the contractor [were] in accordance with the contract and [technical task order]," as well as "comparing that the hours invoiced were the hours estimated in the FMHER." JA374-375, JA1639, JA1755-1756, JA1833, JA1857.

## B.  The Role of the PM

In an FFP-LOE contract, the statement of work ("SOW") lays out what is expected of each individual contractor and what work is "billable" to the contract. JA326. Ironbridge required ITK to provide a PM to manage all aspects of ITK's performance under the contract, including serving as ITK's "point of contact" with NSA officials. JA4413. The PM was also to

oversee the "technical task orders" ("TTOs"), which detailed the work each contractor should do in accordance with the SOW. JA337, JA4413, JA4485-4495.

Under the SOW, the PM was not responsible for the day-to-day technical tasks on Ironbridge. That was the responsibility of the technical task lead. JA1335-1337. Instead, the PM was to "plan, organize, staff, control, and lead the combined efforts for managing the [C]ontract and associated TTOs," including by "provid[ing] assistance" in "[u]pdating program plans and documentation," "[c]reating and maintaining program schedules," "[t]racking program status," "[m]anaging, analyzing and reporting program risks and mitigation plans," and conducting "Quality Assurance." JA4413.

The PM's administrative tasks were detailed in the various TTOs, including "[m]aintain[ing] continuous communication among the [Ironbridge] project team, the Government [PM] and [Technical] Lead," and "management oversight." JA4488.

## C. McComber's Work as PM

The technical work for Ironbridge was classified, so ITK's employees had to perform *technical* work at NSA. JA1347. But the PM's work was *administrative* and thus largely unclassified. Therefore, as the district court found, "the work could be done anywhere and it wasn't confined to 9

to 5." JA7077. Although the Contract had a provision that said, "[u]nless the written approval of the Contracting Officer is obtained in advance, the work herein shall not be performed at any facility, other than the Government site," JA4373, JA334, NSA did not provide a desk for the PM, JA1219, JA1535-1536, and both McComber and her predecessor worked off-site 90% of the time, JA1485-1486, JA3148-3157. Everyone at NSA knew McComber worked mostly off-site, JA6849, and no evidence exists that anyone ever told McComber she couldn't.

McComber intermittently served as part-time PM during the first two years of Ironbridge. JA33-34, JA1531. In 2013, another ITK official, Raynett Colston, assumed the PM role, which she held until mid-March 2016. JA1545-1546. McComber reassumed the PM position at that time. JA2550. It is undisputed that under McComber, Ironbridge was high performing. JA5768, JA6899-6903.

Throughout the roughly nineteen-month period where McComber was PM, she frequently billed eight hours per day to Ironbridge. JA4289-4328. But McComber also frequently billed to overhead while working on other contracts or proposals or when on vacation. JA3383-3384. In total, from March 14, 2016 through September 8, 2017 (the "Indictment Period"), ITK billed NSA 2,603.5 hours for McComber's work, in the sum of $388,878.78. JA36.

### D. Breach of ITK's Timekeeping System

In mid-2016, McComber filed for divorce from her husband of nearly two decades, Bobby Kimmel. JA2577-2578. The separation, divorce, and ensuing child custody proceedings were (and still are) contentious. JA2579-2580, JA6656. The acrimony between McComber and her ex-husband impacted the business. Kimmel was co-owner of ITK and his close friends also worked for the company, including ITK Chief Financial Officer, Dwayne Preston.

Preston resigned from ITK in March 2017, and his wife was terminated from ITK shortly thereafter. JA2311, JA2398-2399. Preston set out to "create havoc" and "confusion" for McComber by hacking into ITK's timekeeping system ("Unanet") and altering time records. JA2318. An internal investigation revealed that Preston accessed ITK's timekeeping system using McComber's log-in credentials at least once. JA2426. During his intrusions, Preston unlawfully accessed and tampered with numerous timecards, including McComber's. JA2426-2427.

### E. NSA-OIG's Investigation

In August 2017, as McComber was investigating Preston's breach and amid child custody proceedings with Kimmel, the NSA-OIG received an anonymous whistleblower letter alleging that McComber was "fraudulently bill[ing]" time to Ironbridge. JA4224. The office opened an investi-

gation by reviewing McComber's NSA "access control" (key card) information to calculate her total time "on-site" at NSA each day. JA535. After comparing that time with McComber's billed hours, NSA-OIG found that, like her predecessor (Colston), McComber was not physically on-site at NSA for approximately 90% of the total hours that "she had recorded on her timesheets." JA36-37. And, consistent with Ironbridge's requirement for a full-time PM, the investigation also showed that McComber frequently billed eight hours each day. JA35-36.

Using that data, NSA-OIG agents Lori Hazenstab and Keith Benderoth prepared a spreadsheet purporting to show, for each day of the Indictment Period that McComber billed to Ironbridge, how much time she spent within access control.[1] The difference between the time billed and the time on-site was listed in a "Discrepant Hours" column. *E.g.*, JA3334. The "Discrepant Hours" column was intended to show time that "wasn't worked" by McComber. JA697.

The spreadsheet also included a column labeled "Notes," which Benderoth populated with excerpts of McComber's personal bank records, business credit card statements, chats, emails, and calendar entries. *E.g.*, JA3334. Debit card charges and ATM withdrawals were used to show

---

[1] NSA uses a system called "Confirm" to track badge swipes in and out of NSA facilities. JA539. This is noted on the spreadsheet as "Confirm Hours."

"[w]here money was spent and what [McComber] was doing at the time in the specific dates where she claimed to be working on [Ironbridge]." JA664.

But the "Notes" column omitted time stamps. For example, "Notes" entries for restaurant credit card charges lacked details on time and duration of meals. The agents also used credit card charges to draw conclusions about what McComber was doing based on her assumed location on specific days. JA807. But there was no way to know if McComber was the individual making the charge, as sometimes other people used McComber's cards. JA2577. Additionally, the agents extracted one-liners from McComber's messages, without context, and added them to the spreadsheet, purporting to show McComber's activities.

The agents purposefully omitted any evidence of McComber *working* off-site, JA697, despite at least 1800 pages of such evidence produced to the government, JA988. The agents also highlighted entries in bright colors to call out dates they believed McComber was not at NSA or when she had personal activities. *See* pp.27-28, *infra*.

The spreadsheet purported to include only days McComber billed time to Ironbridge, JA888, yet it included select weekend and vacation days on which she billed no time to Ironbridge, *e.g.*, JA3371. It also included entries reflecting McComber's weekend plans (days not billed to Ironbridge), highlighted in bright colors. Sometimes, highlighted entries

were duplicated: first when McComber discussed future plans and then when the event actually took place. JA3350-3351 (duplicate yellow entries).

The government did not verify that events annotated on the spreadsheet from McComber's calendar actually took place. JA5409-5411.

## F. Statements

On October 3, 2017, McComber appeared, without counsel, for a sworn interview before NSA-OIG agents. JA3277-3333. During that session, McComber learned about the whistleblower letter and was asked to respond to its allegations. McComber explained she "work[ed] on Saturdays, [she] work[ed] late into the night, [and into] the wee hours of the morning." JA3301. Hazenstab asked McComber how she kept track of billable activities and about her timekeeping practices:

> Q: So, as far as, you know—you said you fill out a timesheet every day.
> A: Yes.
> Q: Okay. At any time, did you ever falsely fill out that timesheet?
> A: No.
> Q: Put any false information on it?
> A: No.

JA3305. Hazenstab questioned the accuracy of McComber's invoices:

> Q: And I know that with LOE—but pretty much every date is listed, and you—you are here—you do log in or put hours in the majority of the time, but they're all—almost all 8-hour days.
> A: Mm-hmm.
> Q: So, that's accurate?

A: Yes, that is accurate, because I—I monitor my time throughout the day on what I'm doing for IronBridge and what's against IronBridge, and then outside of that is, you know, there's corporate things and other things that have to happen that's completely outside of it.

JA3307. On specific time entries, McComber asked if Hazenstab had a calendar McComber could reference, explaining she "d[id]n't recall off the top of [her] head." JA3308. Hazenstab continued to press McComber for details of her whereabouts on specific dates, and after providing details where she could, McComber caveated her response, stating, "but I have to go back to my calendar, which I don't have access to right here." JA3310. McComber also flagged, as discussed *supra*, p.9, her recent discovery that ITK's timekeeping system had been breached. JA3321.[2]

Following this session, ITK's counsel sent a letter to NSA-OIG identifying a handful of days where the hours billed were inaccurate, including several days identified by the whistleblower. JA4235-4237.

NSA-OIG interviewed other witnesses before interviewing McComber. Invariably, the witnesses were first shown the spreadsheet, including the agents' highlighted conclusions, pp.27-28, *infra*, and then asked if they thought McComber was properly billing. JA2217-2223.

---

[2] The court allowed the government to redact details about the breach from the OIG transcript at trial over McComber's objection. *Compare* JA3281-3282, JA3321-3328, JA3331, *with* JA157-158, JA197-204, JA207.

## II.  Procedural History

### A.  Pre-Trial Proceedings

The indictment contains twenty counts. JA32-41.

**Counts 1–19** charge McComber with submitting false claims in violation of 18 U.S.C. 287—alleging McComber caused the submission of false and fraudulent claims to the government "for services that were not in fact performed by [McComber] in connection with [Ironbridge], to wit, the full amount of the hours listed in the invoices" during the Indictment Period. JA38.

**Count 20** charges McComber with making two "False Statements" during the October 3, 2017 interview with NSA-OIG, in violation of 18 U.S.C. 1001(a)(2). The first allegedly false statement was when Hazenstab asked, "At any time, did you ever falsely fill out that timesheet?" and "Put any false information on it?" and McComber responded, "No." JA40. The second allegedly false statement was when Hazenstab noted that McComber billed eight hours on many of the days she billed to Ironbridge and asked, "So, that's accurate?" and McComber responded, "Yes, that is accurate, because I – I monitor my time throughout the day on what I'm doing for Ironbridge and what's against Ironbridge, and then outside of that is, you know, there's corporate things and other things that have to happen that's completely outside of it." JA40-41.

The government alleged "the full amount of the hours" billed by McComber were not "in fact performed," JA38, primarily because, as depicted on its spreadsheet, McComber was on-site at NSA for only about 10% of the hours billed. *See* JA3334-3388.

A "draft" of the spreadsheet was produced by the government in discovery. JA73-74. McComber moved to suppress the spreadsheet, arguing it was improper under Rule 1006 because the "underlying records" were "not accurate." JA44. The court denied that motion on January 13, 2023. JA210.

## B. Trial

The 16-day trial commenced on January 23, 2023.

### 1. Government witnesses

The government presented a total of eighteen witnesses in its case-in-chief. Not one testified that McComber was knowingly defrauding the government.

Four NSA CORs testified. Donald Pugh, the COR from 2015 through September 2017, testified about the process for reviewing invoices and FMHERs, which he used to "make sure that [the contractor] w[as] charging the Government accordingly and correctly." JA1743-1745, JA1749. He never identified a problem with McComber's billing.

Another COR, Jonathan Smith, testified he was satisfied with the work McComber did as PM. JA1505. Jason Doyle, ITK's technical lead on Ironbridge, testified he was always able to find McComber when needed. JA1391. The only NSA official who testified that she was not satisfied with McComber's work was Kristin Mair. But Mair worked with McComber for less than a month, JA1803-1805, JA6292, and when asked why she was not satisfied, she responded that she had "very minimal" interactions with McComber, JA1862-1863.

NSA officials did not have a uniform understanding of a PM's role. JA1191, JA1662, JA1665, JA2078. In fact, there was confusion amongst all government witnesses as to what tasks a PM could bill. The government called similarly unaware former ITK employees. The Ironbridge technical lead testified that he did not know what a PM's duties were. JA1356, JA1375-1376. The whistleblower, Shilo Weir, admitted she "didn't have an understanding of what [McComber's] responsibilities would have been." JA431-432. And while an NSA contract manager testified that "care and feeding" was *not* a billable activity for a PM, JA1662, JA1665, the predecessor PM testified that a substantial portion of the PM's role was "the care and feeding" of the contractors, JA1538.

The government also called agents to testify about their investigation, including the methodology for their spreadsheet. JA525, JA802. Hazenstab admitted that her investigation did not "find a *single* time that an NSA representative attempted to reach [McComber] and could not." JA755.

### 2. Defense witnesses

The defense called five witnesses. Charles Stein, the only expert who testified at trial, opined that a PM's responsibilities would "certainly" include care and feeding of staff, further highlighting lack of knowledge among the government's witnesses and ambiguity about billable activities. JA2200.

McComber testified over two days. JA2472. As explained *infra*, pp.62-64, during cross-examination, the government repeatedly asked McComber questions designed to shift the burden of proof to her. And during closings, the government made numerous comments to the jury suggesting that McComber bore the burden of proof and appealing to juror's pecuniary interests. *See* pp.62-64, 70-72, *infra*.

When it came time for instructions, the court determined a clarifying instruction was needed because of the government's confused position and testimony on the topic of off-site work. JA2025. The court instructed the jury that the government did not contend that merely working off-site

meant McComber was violating the law. JA3097-3098. It then directed the jury that it could only consider McComber's off-site time if it found she was actually working off-site during that time. JA3097-3098.

The jury convicted McComber on all counts.

### C. Post-Trial Proceedings

At the close of the government's case-in-chief, defense counsel moved for judgment of acquittal under Rule 29, and renewed the motion at the close of all evidence. JA2101-2102, JA2889. Following a change in counsel, the defense filed a supplemental Rule 29 motion. JA5068-5100. The court denied the motion on March 22, 2024. JA5868-5936.

Sentencing proceeded in two phases. In November 2023, the court held three days of evidentiary hearings on sentencing-related issues, including loss. JA5317-5348, JA5349-5507. After a period of discovery, sentencing proceedings were held June 26-28, 2024. JA6685-7141.

A central dispute at sentencing was loss. The government and the U.S. Probation Office alleged a loss of $306,186, triggering a 12-point enhancement under USSG §2B1.1(b)(1)(G). JA7238, JA4806. To arrive at that figure, the government started with the hours McComber billed during the Indictment Period and subtracted those it thought "reasonable" to assume she was actually working—76% of her on-site and 15% of her off-site hours. JA4806-4807, JA4818, JA4820, JA5979.

The government sought restitution in the amount of $306,186 based on the same loss figure. JA4817.

McComber objected to the government's loss and restitution amount as unreasonable and unsupported. JA6018-6058. To rebut the government's loss estimate, McComber introduced a sampling of evidence, totaling more than 325 pages, showing her working off-site. *See* JA6121-6445. That work included staffing; onboarding; communicating with NSA contracting officials; working on a trade study; and reviewing and approving deliverables like FMHERs and status reports. *See* JA6044-6050.

McComber also presented NSA-OIG witness testimony supporting how much work she had as PM and how she was always available when needed, even on days that she did not bill Ironbridge.[3] JA6035, JA6566-6567, JA6602, JA7081, JA7083; *see also* JA6586-6587 (when asked, "Does Jacky give the eight hours that she bills -- is she giving eight hours a day to [Ironbridge?]," ITK Vice President Plunkett answered, "Yes, ma'am. I truly believe she is").

---

[3] At sentencing, the court observed there were minimal examples of McComber working on non-billing days, JA6769, neglecting that defense counsel "ha[d] not endeavored to include each and every piece of evidence because it [wa]s not [McComber's] burden to prove loss, and because [McComber] [wa]s not in possession of all documents showing the work she did on [Ironbridge]," JA6020; JA6120.

McComber argued that the loss figure should be *zero* because NSA suffered no pecuniary loss—it got exactly what it bargained for: a full-time PM that indisputably performed well. JA5986. Alternatively, McComber argued that the government's loss estimate was not reasonable because even if the government's spreadsheet were accurate and reliable, and giving the government every benefit of the doubt,[4] the loss amount could be no more than $189,779–nearly half of the government's estimate. JA6055-6056.

The government had nothing to say in response. The entirety of the loss section in the government's response brief was the placeholder: "[Insert text]." JA6672. Despite numerous extensions, the government filed an "UNFINISHED" brief. JA6661, JA6672.

At sentencing, the district court disagreed with both sides on loss. JA7097-7098. Although the court said it had "much to say about" the spreadsheet, it chose not to "spend any time on it" because it was late. JA7096.

The court found McComber's "entire job was administrative and not classified," that it "could be done anywhere," and that it "wasn't confined to 9 to 5." JA7077. The court also found that McComber was responsible

---

[4] McComber presented analysis showing how many hours in a day the government's evidence could *reasonably* account for (assuming the evidence was reliable and true). JA6096-6102.

for a lot of things as PM. McComber was "responsible for all oversight of the contract and TTOs," and was "the official point of contact with the Government COR." JA7077. "Her job [wa]s to plan, organize staff, control and lead the combined efforts from managing the contract and associated TTOs and she ha[d] to notify the COR of any changes in personnel and provide credentials of proposed personnel replacements." JA7077-7078. The court also acknowledged that off-site, McComber could "[i]nterview[]," "submit[] invoices," and "prepar[e] the FMHERs." JA7078. Overall, "[t]here was a lot of juggling, a lot of changing, a lot of orchestrating." JA7078. The court concluded that McComber "was definitely involved in personnel matters with ITK and this could include interviewing, onboarding anyone who was hired, arranging for security clearances, [and] badging"—all of which "could be billed and [] could be done off-site." JA7078-7079. But "even [with] all of that," JA7079, the court found there was not enough "work [] to do … to justify the billings," JA7077, JA7098.

Ultimately, the court took a "guess" and landed on a loss figure of $176,913, giving McComber credit for 15 hours a week. JA7097-7099. The court acknowledged the arbitrariness of that determination, saying, "I don't know that there's even a justification for that." JA7098.

A $176,913 loss amount resulted in a 10-level enhancement to the base offense level of 6, which corresponded to a recommended guidelines

range between 21-27 months. JA7099-7100. Based on a number of mitigating factors, the court imposed a below-guidelines sentence of thirteen months' incarceration, followed by two years of supervised release. JA7119, JA7123. Had the court accepted McComber's position that no loss existed, the guidelines range would have been 0-6 months.

The court also ordered $176,913 in restitution, and a $2,000 special assessment. JA7124.

## SUMMARY OF THE ARGUMENT

Prejudicial evidentiary and constitutional errors deprived McComber of a fair trial and require her conviction be vacated on all counts. In the alternative, the district court's factually and legally unsupported loss determination requires reversal of the restitution order and vacatur of McComber's sentence.

1.   The district court erred in admitting the "summary" spreadsheet—the centerpiece of the government's case—in violation of Rules 1006 and 403 because it purposefully omitted exculpatory evidence, improperly included the agents' opinions, was based on hearsay, and was riddled with errors. Any probative value it may have had was greatly outweighed by the prejudice resulting from the misleading effect it had on the jury.

2.   The evidence was insufficient to convict McComber on all counts.

At most, the government proved that McComber had responsibilities outside of work, which does not prove beyond a reasonable doubt that McComber did not *also* work the hours she billed. Beyond that, the government failed to prove McComber *knowingly* submitted a false or fraudulent claim. Because Counts 1–19 fail for insufficient evidence, so too must Count 20, which depended on proving the invoices materially false.

3.  The district court erred by instructing the jury to consider hours McComber was off-site *only if* she proved she was working during those hours, flipping the burden of proof on its head.

4.  The government committed prosecutorial misconduct by repeatedly arguing that McComber should be convicted because she failed to prove her innocence—a perversion of the fundamental due-process right. The government also appealed to jurors' pecuniary interests by referring to the alleged loss amount in terms of "tax payer funds" and asking jurors how much loss would "make a difference to [them]." JA2965, JA2980.

5.  The restitution order must be vacated because NSA suffered no pecuniary loss. The point of restitution is *not* to punish a defendant, but to make the victim whole. Here, the government committed to paying ITK a sum certain for its services and required McComber to work full-time-equivalent hours to satisfy the contractual requirements. Because she did that, NSA did not suffer any pecuniary loss. And even if restitution were

appropriate, the loss amount was arbitrary and unsupported by evidence.

## ARGUMENT

### I. The District Court Abused its Discretion in Admitting the "Summary" Spreadsheet at the Center of the Government's Case

#### A. Standard of Review

Because McComber objected to the spreadsheet under Rule 1006 through a pre-trial Motion in Limine, JA42, and again under Rule 403 mid-trial, JA1869-1871, this Court's review is for abuse of discretion, *United States v. Walker*, 32 F.4th 377, 394 (4th Cir. 2022).

#### B. The Spreadsheet Was Inadmissible Under Rules 1006 and 403

The district court abused its discretion in admitting the spreadsheet—the cornerstone of the prosecution—because: (1) it failed to meet the requirements of Rule 1006, and (2) its probative value was "substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues, [and] misleading the jury" in violation of Rule 403.

##### 1. The spreadsheet did not satisfy Rule 1006

Rule 1006 allows admission of "charts into evidence as a surrogate for underlying voluminous records" as long as the chart is "an *accurate* compilation of the voluminous records sought to be summarized" and "the records summarized [are] *otherwise [] admissible in evidence*."[5] *United States*

---

[5] Emphasis added unless stated otherwise.

*v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004); 2 McCormick on Evid. § 241 (8th ed. 2022) ("[C]ourts must be scrupulous in [enforcing Rule 1006.]"). Because Rule 1006 evidence presents a high risk of prejudicial error, "a trial court is charged with grave responsibilities to make certain that an accused is not unjustly convicted in a trial by charts." *Gordon v. United States*, 438 F.2d 858, 876 (5th Cir. 1971) (cleaned up). Yet, that is precisely what occurred here.

The inadmissible spreadsheet gravely prejudiced McComber. From the government's declaration in its opening that the spreadsheet provided evidence "for all of [the] counts" charged and included "all of the information" the government was "able to collect and develop," JA247, to its instruction at closing to be sure to look at the "very revealing" and "thorough" spreadsheets when deliberating, JA2967, the spreadsheet was billed as the jury's primary reference point and bore an unjustified endorsement of reliability.

The spreadsheet violated Rule 1006 three times over because it (i) was not a summary, (ii) contained inadmissible evidence, and (iii) was inaccurate.

### i.    *The spreadsheet was not a summary*

The spreadsheet violated Rule 1006's most basic requirement because it was not a summary. Although "[s]ummary testimony need not summarize all the records at issue" and "may be based on a mere subset," where that is the case, the summary cannot "purport to represent 'all the evidence.'" *United States v. Markovich*, 95 F.4th 1367, 1378 (11th Cir. 2024). The government's spreadsheet did just that. Despite purporting to be a summary of robust investigations conducted by NSA-OIG, JA247, JA2967, the spreadsheet was inherently one-sided and only reflected a fraction of the evidence gathered. The agents selectively whittled down over 30,000 pages of discovery into a single "Notes" column on a 13-column-wide 55-page spreadsheet. JA3334-3388.

Worse still, rather than letting the jurors form their own conclusions as to the significance of the cherry-picked entries, the spreadsheet improperly contained (a) the agent's opinions of the evidence, and (b) demonstrably false facts.

"Rule 1006 summaries should not include witnesses' conclusions or opinions." *Bluiett v. Pierre M. Sprey, Inc.*, 2009 WL 10685350, at *4 (D. Md. Jan. 27, 2009). Nor should they "contain inferences and assumptions that are not fully supported by evidence in the record, [or] outright argument." 2 McCormick on Evid. § 241; *Eichorn v. AT&T Corp.*, 484 F.3d 644, 650 (3d Cir. 2007) (same).

Here, the spreadsheet was full of impermissible opinions. *Bluiett*, 2009 WL 10685350, at *4. The agents drew the jury's attention to these opinions by color-coding the spreadsheet, "[j]ust to give a good visual." JA606. They highlighted days where McComber was not on-site at NSA in blue. JA544. "Notes" entries were also color-coded based on the agents' opinion of the evidence: entries they decided represented travel were annotated in yellow, JA771; business development and other work they concluded was unrelated to Ironbridge were blue, JA771; social matters, like happy hours and parties, were orange, JA833; and golf outings green, JA838. These colors reflected the agents' personal interpretation of what the evidence showed and remained on the spreadsheet given to the jurors, denying them the opportunity to form their own opinions of the "evidence."

This color-coding system was improper and highly prejudicial to McComber for several reasons.

1.  Admitting Rule 1006 evidence is "prejudicial" when it offers "conclusions unsupported by the evidence." *United States v. Spalding*, 894 F.3d 173, 186 (5th Cir. 2018). Here, the agents offered their conclusions on the spreadsheet by color-coding entries to show that McComber was busy with non-billable activities without so much as verifying the accuracy of the source, or worse, ignoring evidence from the same underlying source

that proved the color-coding conclusion wrong. For example, the spreadsheet had two yellow entries on December 12, 2016 discussing an upcoming trip to Georgia, followed by a single yellow entry on December 13, 2016, which stated: "Augusta, GA." JA3364. Yet the source message the agents used to populate those entries makes clear that McComber *never went* on that trip. JA3961. At a post-trial hearing, Benderoth acknowledged that although the trip was canceled, the spreadsheet made no mention of that fact, leaving only the agents' yellow coding to represent to the jury the plainly inaccurate and highly prejudicial conclusion that McComber was traveling on days she was billing. JA5399-5400.

2.  Compounding the prejudice to McComber, and illustrating how the spreadsheet was more of a demonstrative than summary evidence, the government relied on the color-coding scheme during closing argument. JA2992. In a dramatic visual, the prosecutor laid pages of the spreadsheet across the courtroom floor and told the jury to look at all "the blue in the[] spreadsheets." JA2991-2992. Those blue entries, the prosecutor continued, "represent the days to which the Defendant billed time to [Ironbridge] but did not access NSA facilities." JA2992. That, the prosecutor said, "is an ocean of fraud." JA2992.

3.  The agents also exercised personal judgment and included on the spreadsheet their opinions about what McComber was doing based on how

the agents depicted incomplete or illegible calendar entries. McComber's calendar was filled with overlapping and conflicting entries. JA5401-5402, JA5463. With no evidence as to whether she attended one conflicting calendar event over another (or if she attended either at all), the agents hand-selected which ones to include on the spreadsheet.

For example, the spreadsheet noted McComber traveled to Nashville on December 15, 2016, and billed a full eight hours to Ironbridge. JA3365. But while it is true that McComber's calendar had entries titled "Southwest" on December 15, 2016, McComber also had a Southwest Airlines calendar entry the following day—a day she took vacation and did not bill any time to Ironbridge. JA3481, JA3365. The spreadsheet made no mention of that flight because it fell on a non-billing day. Post-trial, Benderoth conceded he had no way to distinguish whether McComber took the flight on the day she billed or the day she took vacation; nor did the agents "know if that was a ticket for her or … a ticket for somebody else." JA5401-5402. Nevertheless, the agents put the non-vacation day flight on the spreadsheet, leading the jury to believe McComber was traveling on a day she billed to Ironbridge.

## ii.     *The spreadsheet contains inadmissible evidence*

Even if the spreadsheet were fairly considered a "summary," it should have been excluded because the underlying evidence it purports to summarize was inadmissible for the purpose it was used.

Rule 1006 "is not an end around to introducing evidence that would otherwise be inadmissible." *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009). When Rule 1006 evidence "is in the form of a writing or a chart," it presents the problem of hearsay within hearsay, and thus is "admissible only if the written summary or chart and the source materials each are within an exception to the hearsay rule or are being offered for some non-hearsay purpose." 11 Wright & Miller, Fed. Prac. & Proc. § 8043 (3d ed. 2022); *United States v. Recio*, 884 F.3d 230, 234 (4th Cir. 2018). "[J]ust as the proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception, ... so too must the proponent of a Rule 1006 summary based on hearsay evidence establish that the materials summarized are admissible." *United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012).

Here, the government populated the spreadsheet with—and repeatedly called the jury's attention to—information derived from hearsay in the form of: (1) credit card statements and (2) calendar entries to prove the truth of McComber's whereabouts and activities. Although the parties stipulated to the admissibility of those underlying exhibits, JA284-286,

the Rules "contemplat[e] that evidence may be admissible for one purpose without being admissible for all others," *United States v. Wheeler*, 753 F.3d 200, 206 (D.C. Cir. 2014). The exhibits were inadmissible as used here because the government picked bits and pieces of information from the stipulated exhibits and used them for the decidedly inadmissible purpose of proving the truth of the matter asserted—*i.e.*, where McComber was and "what she was doing with her time outside of the NSA when she was not at the NSA." JA5356; *see* Fed. R. Evid. 801(c).

Because the spreadsheet is "comprised of classic hearsay—statements made outside of court by persons other than the declarant, introduced for the truth of the matter asserted"— McComber's location on particular dates at particular times—"and not admissible under any hearsay exception," "the admission of [the spreadsheet] constituted reversible error." *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1160, 1165 (11th Cir. 2004).

***Credit card statements.*** When an out-of-court statement is offered for its truth, it is hearsay. *United States v. Gonzales-Flores*, 701 F.3d 112, 117 (4th Cir. 2012). Although credit card statements ordinarily fall under the business-records hearsay exception, *United States v. Wein*, 521 F. App'x. 138, 139 (4th Cir. 2013) (per curiam) (citing Rule 803(6)), they nevertheless constitute hearsay when offered to prove the identity or location

of the person making the purchase, rather than the time, location, or amount of the purchase. *United States v. McIntyre*, 997 F.2d 687, 698-99 (10th Cir. 1993) (documents introduced to prove that an individual was in a motel on a specific date were hearsay); *United States v. Watkins*, 519 F.2d 294, 296-97 (D.C. Cir. 1975) (receipts for rent offered to prove defendant lived at address were hearsay).

Here, the government included information from McComber's credit card statements on the spreadsheet to prove the truth that McComber was present at a specific off-site location on a specific date and time, and asked the jury to infer McComber was both: (a) not working, and (b) billing Ironbridge during that time. The trial is full of examples showing why the credit card statements—classic hearsay—were unreliable for that purpose. JA2577 (McComber testifying that other people used her credit card), JA2389 (Preston testifying that McComber's credit card was a business card used by others); *compare* JA3779-3780 (charges on McComber's credit card on May 24-25, 2017 made from Arizona), *with* JA3378-3379 (spreadsheet places McComber in Maryland those days).

**Calendar Entries.** The spreadsheet included select entries from McComber's calendar, offered to prove McComber's actual location at a specific time, to show she was not working but billing the government. The

calendar entries were vague and oftentimes illegible. Benderoth acknowl-
edged post-trial that because McComber's calendar was produced in PDF
format, "[the government couldn't] click on it and actually see more detail."
JA5402. Notwithstanding the lack of discernible details, the government
used calendar entries throughout the spreadsheet.

Matters of legibility aside, calendar entries "constitute[] inadmissible
hearsay" when they are offered, like here, to prove an individual actually
attended an appointment on her calendar, *United States v. Dominique-
McClain*, 623 F. Supp. 3d 33, 38 (E.D.N.Y. 2022), rather than just what
she "planned to do on those days," *United States v. Looking*, 156 F.3d 803,
811 (8th Cir. 1998). Even if the calendar entries could conceivably fall
within a hearsay exception, the trial testimony shows the entries lacked
"sufficient indicia of reliability to merit the fact-finder's consideration."
*United States v. Lawrence*, 349 F.3d 109, 120 (3rd Cir. 2003). McComber
testified that some entries functioned merely as "reminders," JA2656; *see
also* JA2558 (she included "all routine appointments" for her children as
reminders, but her nanny took them); certain recurring events she "hardly
ever went to," JA2676; and others she did not attend, *see* JA2674.

*       *       *

Even if the spreadsheet contained a mix of admissible and inadmissi-
ble evidence, it should have been excluded. When the government chose to

present a "summary," it was required to present one *without* inadmissible evidence, and it failed to do so.

### iii. *The spreadsheet is inaccurate*

The spreadsheet also should have been excluded under Rule 1006 because it was permeated with errors. *United States v. Inusah*, 2024 WL 1156104, at \*4 (4th Cir. Mar. 18, 2024) (Rule 1006 requires "factual accuracy of [] chart[s]"). Benderoth admitted to multiple inaccuracies in the spreadsheet during a post-trial hearing. JA5406.

For example, in numerous places, the spreadsheet depicts the record evidence on the wrong date, to McComber's detriment. *See* pp.27-29, *supra*. Benderoth acknowledged he "should have been a little bit more diligent" in presenting the underlying information on the spreadsheet, JA5406, conceding he "was mistaken" when he "accidentally put the [credit card] charge date and not the departure date" for several entries representing McComber's travel, JA5415. By using the wrong date for those entries in the "summary," it created the appearance that McComber was gone for longer than she actually was. JA5414 (conceding the spreadsheet misrepresents McComber's March 2017 trip to Vegas, showing her there an extra day on which she billed eight hours); JA5411 (same error for March 2017 trip to Texas).

Perhaps most egregiously, the spreadsheet contained information the government knew was verifiably false. As the district court noted in its Rule 29 opinion, "[t]he summary chart [] included information reported by the whistleblower, even if it was later unsubstantiated." JA5918.

The district court abused its discretion in dismissing the spreadsheet's inaccuracies as *de minimis*. The court reasoned, "[t]o the extent that there were a handful of errors and omissions in the government's summary exhibits, the jury was made aware of them. The jury was not required to throw out the baby with the bath water." JA5936. Although it came out at trial that the spreadsheet misleadingly included some days that McComber did not actually bill to Ironbridge, JA888, and a formatting issue was clarified to correct the date of one entry, JA994, these exchanges hardly "made [the jury] aware" of the spreadsheet's many errors, JA5936. Nor was there an opportunity for a curative instruction because Rule 1006 "summaries are substantive evidence, [not requiring a] limiting instruction." 2 McCormick on Evid. § 241.

The court's pronouncement that "[t]here are errors and omissions" on the spreadsheet, JA7096, should end the inquiry. Contrary to the court's justification that "the occasional mistake [] does not discredit the entire report," JA7096, Rule 1006 mandates the evidence must be an *accurate*

summary. *Janati*, 374 F.3d at 272. Because there is no question that the spreadsheet contained inaccuracies, it was inadmissible under Rule 1006.

## 2. The spreadsheet should have been excluded under Rule 403

The spreadsheet was also inadmissible under Rule 403, because "its probative value [was] substantially outweighed by a danger of," among other things, "misleading the jury." "Rule 1006 evidence [can be particularly] misleading because it omits important aspects of the voluminous source materials or adds matters not present in those materials." 11 Wright & Miller, Fed. Prac. & Proc. § 8043.

As the district court aptly recognized during trial, the government's case, anchored by the spreadsheet, was confusing for the jury because it strongly implied that any off-site work violated the contract, despite the government's concession that it did not. JA1947 ("I'm concerned about the impression to the jury that [] working off-site isn't work because [McComber] wasn't allowed to work off site."), JA2021-2022 ("[I]t does seem what came out [of the government's case] is … if she was working[,] it was off-site and she wasn't supposed to. So she couldn't have been working."), JA2023-2024 ("My concern is that the jury [wa]s led to believe if [McComber] was working off-site she couldn't possibly be working, [and] that's not entirely accurate.").

While waffling as to whether McComber *could* work off-site, the government's apparent theory of the case was that there wasn't enough PM work to fill McComber's time. JA5934-5935. Yet, the spreadsheet's focus on the *location* of the work confused the jury as to the essential elements of the case.[6] The jury could have easily flipped through the spreadsheet, saw the "ocean" of opinion-based and unreliable highlighting, and concluded that for the days McComber billed Ironbridge while off-site, she was overbilling. Because evidence that "confuse[s] the issues" must be excluded under Rule 403, the spreadsheet was inadmissible. *United States v. Ro*, 465 F. App'x 217, 222 (4th Cir. 2012).

\*     \*     \*

Under these circumstances, this Court is "left with no choice but to conclude that the district court abused its discretion" in admitting the spreadsheet. *United States v. Hart*, 295 F.3d 451, 459 (5th Cir. 2002). Moreover, "there can be no question that this abuse of discretion 'had substantial and injurious effect or influence in determining the jury's verdict'" because of the "complete reliance that the jury must have had on [the government's] 'summary' evidence." *Id.*

---

[6] The district court, too, focused on McComber's location in its Rule 29 opinion. JA5897-5898 (referencing spreadsheet, stating "the government introduced evidence" showing that on "dates when defendant billed eight hours to the Contract," she was "out-of-town").

## II. The District Court Erred in Denying McComber's Motion for Judgment of Acquittal

Because the government failed to meet its burden of proving beyond a reasonable doubt the elements of the charged offenses, the district court erred in denying McComber's Rule 29 motion. JA5868-5936.

### A. Standard of Review

This Court reviews denial of a Rule 29 motion de novo, *United States v. Smith,* 451 F.3d 209, 216 (4th Cir. 2006), applying a "sufficiency of evidence standard," *United States v. Bradley*, 164 F.3d 626 (4th Cir. 1998). "Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." *United States v. Powell*, 469 U.S. 57, 67 (1984). A jury's verdict will not be sustained unless, "viewing the evidence in the light most favorable to the prosecution, the verdict is supported by 'substantial evidence,'" *i.e.*, "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Smith,* 451 F.3d at 216 (cleaned up). "While all inferences must be made in favor of the prosecution, leaps of logic should not be." *Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 1994).

## B. Conviction on Counts 1–19 Was Based On Insufficient Evidence

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [s]he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Rule 29 ensures a defendant's rights are protected by requiring that a court, on a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

To prove false claims under 18 U.S.C. 287, the government had to show McComber presented each invoice "knowing that it was false, fictitious, or fraudulent as to a material fact." JA3093; *United States v. Ewing*, 957 F.2d 115, 119 (4th Cir. 1992). The *volume* of evidence introduced by the government is meaningless if it does not establish each element beyond a reasonable doubt. The government did not meet this burden. Even viewing the record in the light most favorable to the prosecution, insufficient evidence existed for the jury to find that *any*—much less all—of the nineteen invoices were: (1) materially false, or (2) that McComber *knew* that any of these invoices were false. Either failure of proof is sufficient to require acquittal on Counts 1–19, and both are.

### 1. The government failed to prove that McComber submitted any materially false invoices

The government alleged that McComber submitted nineteen inflated invoices amounting to nineteen counts of materially false claims. The government was required to prove that McComber presented each invoice knowing it was false as to a material fact. A claim is "false if it was untrue when made and was then known to be untrue by the person making it or causing it to be made." JA3095. A fact is material "if it was capable of influencing the government's decision." JA5927. The government did not meet this standard.

1.    The government based its case on a pyramid of unreasonable inferences. Based on a smattering of unreliable calendar events and credit card statements, the government asked the jury to assume McComber was *not* working unless she was at NSA. But that is too far a leap to make. *United States v. Samad*, 754 F.2d 1091, 1098 (4th Cir. 1984) ("The inferences the government suggests might be drawn from these items of evidence are simply too attenuated to perform the service.").

As discussed *supra*, pp.10-12, the government's case was built around a spreadsheet depicting McComber's on-site/off-site time. Even if the spreadsheet were admissible, it had no probative value to the government's theory that McComber was not working when she was off-site. At most, the spreadsheet established that McComber was a hard-working

mother who juggled multiple responsibilities during the nineteen-month period that she served as PM. But it can both be true that McComber spent time with her family and built a network for her company while *also* working full time on Ironbridge. Evidence of McComber's routine daily activities are consistent with the hours she billed.

In *United States v. Cole*, 491 F.2d 1276, 1280 (4th Cir. 1974), this Court reversed denial of a motion for judgment of acquittal where the defendant was charged with submitting false travel vouchers to the government that were only permitted for use on official business. To prove the vouchers were materially false (*i.e.*, not for official business travel), the government offered witness testimony about non-business activities the defendant engaged in while on the business trips at issue. Finding the defendant's time on the trips "not exhausted" by the non-business activities presented, this Court held the verdicts were "based upon sheer speculation and conjecture," noting "it is fundamental that a jury should not be asked to determine an issue which can be decided only in that fashion." *Id.* The same is true here where the government did not show that McComber's billable time was exhausted with evidence of non-billable activities.

Indeed, for 83 days of the 326-day indictment period (25%), the government failed to offer even a single note about McComber's activities. JA3334-3388. But even when the government did offer glimpses into

McComber's activities, no evidence existed that McComber was not working on Ironbridge the remaining hours of the day, and the government fell far short of its burden to prove McComber's hours were materially false as to each of the nineteen invoices. Ironbridge did not "require a set schedule of work" such as 9AM to 5PM, meaning that any hours worked on Ironbridge outside of normal business hours would be billable. JA983-984.

2.  In support of McComber's Rule 29 motion, defense counsel established (through detailed review of the evidence) that, even drawing every inference in the government's favor, there was still ample time for McComber to work the hours she billed. Defense counsel organized the evidence adduced at trial into a month-by-month analysis of daily "workable hours" (*i.e.*, hours McComber *could have been* working), in comparison to the number of hours billed. JA5084. Using conservative estimates, JA5084-5086, the analysis showed there was not a single month in which the hours McComber billed exceeded the "workable hours," and thus, insufficient evidence existed for the jury to find that any invoice was materially false, JA5082-5090, JA5101-5316.

Nor did the government's witness testimony bridge that gap:

***No opportunity to observe.*** At trial, the government presented witnesses who testified that they did not observe McComber working the

amount of hours reflected on her invoices. *E.g.*, JA439-440 (Weir testimony). But those same witnesses also testified they were with McComber for only a small fraction of each day and thus had no opportunity to observe whether McComber was working the remaining hours of the day. JA441 (Weir testifying McComber spent "[t]wenty-five percent or less" of her time in ITK's office), JA433 (when asked "to what extent was it possible for you to observe [McComber's] comings and goings" in ITK's first office, Weir testified: "It wasn't.").

Similarly, the government elicited testimony from former ITK employee Paul Rooney that McComber was not at ITK's office "very often" and that her focus was on "business development." JA1619. But Rooney left ITK in 2015, JA1609-1610, over a year before the Indictment Period began, and therefore his testimony could not support an inference that McComber was not working the hours she invoiced during the Indictment Period.

Kristin Mair testified that McComber's work as Ironbridge PM was less than satisfactory because their interactions were "very minimal." JA1862-1863. But their interactions were minimal because Mair had no opportunity to work with McComber on Ironbridge—Mair replaced Pugh as Ironbridge COR in *September 2017*. JA1743, JA1805, JA1862 (Mair testifying about her lack of relevant knowledge).

The district court's Rule 29 opinion improperly credited Mair's testimony that "the main person ... [she] talk[ed] to [on] Ironbridge was Craig Plunkett." JA5913 (quoting JA1807). That makes sense because Plunkett took over as PM on Ironbridge when McComber stepped down from the position in September 2017. JA1673. It was thus not a permissible inference to draw from Mair's testimony that Plunkett performed the role of PM for McComber before September 2017.

Nonetheless, the government points to those witnesses' testimony as evidence that McComber could not have been working the amount of hours she invoiced, simply because none of them testified that they saw her doing so. JA5517. The government offered pure speculation from witnesses who "usually had little idea of where [McComber] was or what she was doing with her time," *id.*, to support the inference that she must not have been working. Such speculation cannot form the basis of a material falsity finding. *United States v. Chujoy*, 207 F. Supp. 3d 626,653 (W.D. Va. 2016) ("[A] jury may not rely on pure speculation to convict.").

***No knowledge of program manager duties.*** The government also relied on witness speculation that there was not enough work for a PM to justify the amount of hours McComber billed. This testimony came from witnesses who had never been PMs and admittedly did not know what a PM does. JA431-432 (Weir "didn't have an understanding of what

[McComber's] responsibilities would have been"), JA490 (Weir had never read the Ironbridge Contract), JA1072 (NSA official did not "know what a program manager exactly has to do"), JA1194 (COR was not "really involved" with McComber's "specific duties" so could not "answer" what McComber "was doing as the program manager"), JA2078-2079 (NSA official was "not familiar with what deliverables were on this contract" and had "[n]ot much understanding" of what a PM did).

"A jury is entitled to make only 'reasonable inferences' from the evidence." *Samad*, 754 F.2d at 1097 (citation omitted). It was unreasonable to infer from these witnesses that there was not enough work for the PM to do and thus McComber's off-site hours must have been false. The government held out its witnesses' testimony as the final say on what the PM job entails, but these lay witnesses lacked the requisite knowledge and expertise to offer such testimony—particularly to the extent the testimony directly contradicted the SOW.

In *Cole*, for example, the court held it was improper to allow jurors to "make a post-factum appraisal of the validity of [] military orders [] by applying nothing other than their own civilian criteria" with no evidence from "the military establishment" on the issue. 491 F.2d at 1280. Similarly here, the jurors were ill-equipped to apply their "civilian criteria" to assess

the nuances of government contracting, with nothing but conflicting and unknowledgeable witness testimony to assist.

### 2. The government failed to prove that McComber knowingly submitted any materially false invoices

Insufficient evidence existed for the jury to conclude that McComber *knowingly* submitted false invoices. To prove knowledge, the government had to establish beyond a reasonable doubt that McComber acted "voluntarily and purposefully and not by mistake, carelessness, or other innocent reason," and that she "*knew* [*each*] *claim was false or fictitious*." JA3095; *United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003). Even viewed in the light most favorable to the government, the evidence did not meet this standard.

1.   The government would like to paint this case as "a conventional fraud case, in which the defendant knowingly billed the government for more hours than she worked," JA5872, but it is not. This is a case involving a contract type that is inherently ambiguous (FFP-LOE); a complex federal regulation (FAR 16.207); and a factual history that supports McComber's interpretation of both. Zero evidence suggests McComber had any reason to think the hours she was working and billing were unlawful.

The knowledge requirement in a criminal statute "plays a critical role in separating a defendant's wrongful from innocent conduct." *Ruan v. United States*, 597 U.S. 450, 461 (2022). A "strong scienter requirement" is

even more important in cases like this one where the "regulatory [or contractual] language" is "ambiguous," "written in generalit[ies]," and "open to varying constructions," in order to "help[] ... diminish the risk of over-deterrence, *i.e.*, punishing [] conduct that lies close to, but on the permissible side of, the criminal line." *Id.* at 459 (cleaned up).

"What matters ... is whether [McComber] knew the claim[s]" she was submitting for her monthly work on Ironbridge "w[ere] false." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739,743 (2023).[7] Central to that inquiry is what type of work McComber thought was properly billable, based on her interpretation of the SOW. The evidence shows that McComber unequivocally believed all of the time she billed to Ironbridge was billable. JA2559, JA2562.

McComber's belief that she was accurately submitting her timesheets—unchallenged by any evidence—was particularly justified given the ambiguity of the contract. This ambiguity is evident in the conflicting trial testimony on what qualified as billable work under the SOW. For example: Colston testified that "care and feeding of the employees" was one of her "primary responsibilities" as PM, JA1538, consistent with testimony

---

[7] *See also Ewing*, 957 F.2d at 120 (Section 287 knowledge requirement is a "subjective mental state"); *Bolden*, 325 F.3d at 494 (Section 287's knowledge requirement is met if the defendant "acted with knowledge that the claim was false" and "with a consciousness that he was either doing something which was wrong, or which violated the law").

by NSA officials that "care and feeding" was a substantial portion of the PM's role, *e.g.*, JA1076. And the only expert admitted in the case testified that a PM's responsibilities would "certainly" include "care and feeding of staff." JA2200. Yet other NSA officials testified that they did not think care and feeding was billable. JA1662, JA1665.

Staffing was clearly listed as a PM duty on Ironbridge, JA4439, and while some witnesses agreed that was a properly billable task, *e.g.*, JA1539-1540, others did not, *see* JA1191. But there was further confusion over what "staffing" entailed and which staffing-related activities were billable. *Compare* JA1540, *with* JA1576 (Colston did not think interviewing was billable but testified that the PM was "responsible for ensuring [] the right person" was staffed for an opening). Further demonstrating the ambiguities related to "staffing," at sentencing, after finding that interviewing was billable and could be done off-site, JA7080, the court questioned what exactly interviewing entailed and who would have been involved, JA7087.[8]

None of those witnesses testified that McComber knew at the time she submitted the claims to NSA that she was billing for work she should

---

[8] Contractual ambiguity also affected the jury. One juror asked the court to define the term "obligated" after a contracting officer testified that contractors on an FFP-LOE are "obligated to provide" the specified level of effort to avoid breach. JA4801.

not have been. To the contrary, McComber had every reason to believe her interpretation was correct and her billing truthful. She openly worked off-site the majority of the time, she never sought to conceal what she was doing or where she was, and nobody at ITK or NSA gave her any reason to believe her off-site time or the work she was counting as billable was not. And month after month, the government paid invoices for full-time PM work that was conducted substantially off-site, first for Colston and then McComber.

Those facts distinguish this case from cases like *Schutte*, where the evidence showed defendants "received notice" that they were misinterpreting a term in the contract, "comprehended those notices[,] and then tried to hide" their actions. 598 U.S. at 754. And from cases in this Circuit like *Bolden*, where evidence showed that the defendant had been informed that his methodology for submitting claims was "inaccurate, yet [he] instructed her to go ahead and bill Medicaid [anyway] because it was necessary 'to get money into the facility.'" 325 F.3d at 494-95; *see also United States v. Glymph*, 96 F.3d 722, 727 (4th Cir. 1996) (sufficient evidence of knowledge where, in response to open concern about contractual compliance, defendant "responded that they had not been caught yet," and as "the owner of the company," "he would run [it] the way he wanted to"). There is no remotely similar evidence of a culpable mental state here.

Because there is no evidence McComber knew her invoices were false, the inconsistent testimony of a few witnesses that *they* believed certain tasks were non-billable is irrelevant. Under the Supreme Court's subjective knowledge standard, none of the conflicting witness testimony about what was billable or whether it was reasonable for McComber to think she was properly billing eight hours a day matters. The only thing that matters is McComber's "knowledge and subjective beliefs—not [] what an objectively reasonable person may have known or believed." *Schutte*, 598 U.S. at 749.

2. To be sure, "facial ambiguity [in a regulation] alone is not sufficient to preclude a finding that [a defendant] knew their claims were false." *Id.* But this case must be analyzed under the lens of government contracting. Where, like here, there exists ambiguity in a government contract, the rule of *contra proferentem* applies. *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997). Under that long-standing principle, any ambiguity in a contract is to be resolved in favor of the party that did not draft the contract; here, McComber. *See Maersk Line, Ltd. v. United States*, 513 F.3d 418, 423 (4th Cir. 2008). Nowhere is that principle more vital than in defense contracts where the stakes are high (sometimes life or death) and the terms and regulatory constraints complex.

Even if McComber was mistaken about what tasks were actually billable to Ironbridge, and even if the jury believed it was unreasonable for McComber to hold the beliefs she did, there is no evidence from which a rational jury could conclude beyond a reasonable doubt that McComber subjectively believed she was submitting false claims for any month in the Indictment Period.

3. The government's contemporaneous knowledge of what McComber planned to bill each month and that she worked primarily off-site, combined with ambiguity in the contract, negates any inference that McComber had "the scienter required for an FCA violation." *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002); *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) ("[T]he government's knowledge effectively negates the fraud or falsity required by the FCA."). At least six circuits, including this one, recognize the "government knowledge defense" (also called the "government knowledge inference") whereby if "the government knows and approves of the facts underlying an allegedly false claim prior to presentment, an inference arises that the claim was not knowingly submitted, regardless of whether the claim itself is actually false." *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 751-52 & n.17 (3d Cir. 2017) (collecting cases).

Here, the government knew—indeed, *required*—that McComber work and bill 40 hours each week. JA2549-2550; *see supra*, p.6 (monthly FMHERs projected future billing). The government also knew that, like her predecessor, McComber worked primarily off-site. JA1460, JA2090, JA6849. Yet McComber was convicted under the FCA based on a presumption that if she was off-site she wasn't working because there was not enough work to fill 40 hours a week. In short, when the government and defendant are in open communication as to billing such that the defendant cannot know she is doing anything wrong in submitting claims based on that mutual understanding, then the defendant lacks scienter. *See Burlbaw*, 548 F.3d at 953-54. That's exactly what happened here.

## C. Conviction on Count 20 was Not Based on Sufficient Evidence

To sustain a conviction for making a false statement in violation of 18 U.S.C. 1001(a)(2), the government had to prove: (1) McComber made a material statement or representation that was "false, fictitious, or fraudulent," and (2) "the false, fictitious or fraudulent statement was made knowingly and willfully."

### 1. The government failed to prove McComber made a materially false statement

The government failed to present evidence sufficient to carry its burden of proof to show that either of the two statements in Count 20 were

materially "false, fictitious, or fraudulent." 18 U.S.C. 1001(a)(2).

The government alleged that McComber made a false statement when she answered "no" in response to Hazenstab's question whether she "falsely fill[e]d out" her timesheets or "[p]ut any false information on it." JA40-41. But as discussed *supra*, pp.40-46, the government did not prove beyond a reasonable doubt that any of McComber's invoices were in fact materially false. Yet that is all that was offered to the jury as a basis for finding McComber's statement false. That is not a reasonable basis and cannot support a conviction on Count 20.

There was also no evidence that McComber lied about monitoring her time. The government's argument was that she "typically did not enter her time on a daily basis," supported only by evidence that McComber did not open and close her biweekly timecards each day. JA5565, JA2993. But "monitoring" time does not mean "enter[ing] time on a daily basis." JA5565. There are other ways to monitor time. The agents never asked McComber for clarification on how she monitored her time, and at trial she testified that she did so by keeping notes of her tasks. JA2660-2661.

There is no basis to support a finding of material falsity as to either of the two statements at issue in Count 20. With no evidence that the statements McComber made were false, the government failed to carry its burden of proof to convict on Count 20.

## 2. The government failed to prove McComber knowingly and willfully made a false statement

The government also failed to prove McComber *knowingly and willfully* made a false statement.

Unless a statute states otherwise, "knowingly" means the defendant had "knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 192-93 (1998). As to Count 20, that would require McComber to have had knowledge that the statements she made to Hazenstab were false.

Additionally, the government was required to prove McComber made each statement "willfully," meaning it was "done with the intention to do something the law forbids"; "that is[,] with a bad purpose to disobey the law." JA3108; *Bryan*, 524 U.S. at 191 ("'willfully' ... typically refers to a culpable state of mind").

The government failed to prove both knowledge and willfulness required to support a conviction on Count 20.

*First*, no evidence exists that McComber knowingly and willfully made a false statement when she told Hazenstab she never "falsely fill[ed] out that timesheet" and never "[p]ut any false information on it." JA3305; Section II.B.2, *supra*. Rather, the evidence showed McComber believed her timesheets were accurate at the time she made those statements. JA2663. McComber caveated her statements to Hazenstab by saying she would

need to check her calendar, JA3308-3309, and flagged that ITK had recently discovered a breach in its timekeeping system, JA3321. Even more, after the interview, McComber promptly contacted Hazenstab (through ITK's lawyer) to correct a handful of entries. JA4233-4237. This is hardly the stuff of a culpable state of mind, let alone a knowing violation of law.

*Second*, no evidence exists that McComber knowingly and willfully made a false statement when she stated that she "monitor[ed] [her] time throughout the day on what [she was] doing for Iron[b]ridge." JA3307. McComber did, in fact, monitor her time, JA2559, so she could not have known her statement to be false. And her request to see her calendar before giving a definitive response, followed by her prompt follow-up with NSA-OIG to correct her entries, shows a lack of criminal willfulness necessary to support Count 20.

Because the government failed to establish that McComber *knew* either statement was false or that she *willfully* made a false statement, the conviction on Count 20 must be reversed.

## III. The District Court Committed Plain Error by Erroneously Instructing the Jury

McComber's conviction must be reversed on all counts because the court issued a jury instruction that shifted the burden of proof to McComber to prove her innocence in violation of settled Supreme Court precedent.

## A.  Standard of Review

Where a defendant does not object to a jury instruction, this Court reviews the instruction for plain error. *United States v. Hastings*, 134 F.3d 235, 239 (4th Cir. 1998). To establish plain error, an appellant must show "that an error occurred, that the error was plain, and that the error affected [her] substantial rights." *Id.*; Fed. R. Crim. P. 52(b). This Court has discretion to correct any error that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Hastings*, 134 F.3d at 239.

## B.  The District Court Issued a Jury Instruction on Off-Site Work that Shifted the Burden of Proof to McComber

In any criminal case, "[t]he first presumption is that a defendant is innocent unless and until the government proves beyond a reasonable doubt each element of the offense charged." *Clark v. Arizona*, 548 U.S. 735, 766 (2006). And the Due Process Clause "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Francis v. Franklin*, 471 U.S. 307, 313 (1985).

In crafting a jury instruction, the court must "adequately inform[] the jury of the controlling legal principles without misleading or confusing the jury." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011). Without sufficient

instruction, "the jury becomes mired in a factual morass, unable to draw the appropriate legal conclusions based on those facts." *United States v. Lewis*, 53 F.3d 29, 34 (4th Cir. 1995).

The government was required to prove beyond a reasonable doubt that "the number of hours reported for the Defendant's work as the program manager on the Ironbridge contract for a particular month [was] materially false, fictitious, or fraudulent." JA3096. In other words, to prove material falsity, the government was required to affirmatively establish McComber was *not* working during the hours that she billed off-site.

Instead of doing that, the government's case-in-chief centered on creating a presumption that if McComber was off-site (which she was for the majority of hours billed), then she was not working. Indeed, that was the whole point of the spreadsheet: if McComber was anywhere other than NSA on a given day, she could not possibly have worked eight hours. This perversion of the standard of proof was so obvious that it led the court to remark at the close of the government's case-in-chief in a side-bar: "I'm concerned about the impression to the jury that ... working off-site isn't work because she wasn't allowed to work off site." JA1947.

To try to clarify, the court twice gave an instruction drafted by the government:

The Government does not contend that the Defendant violated the law if she worked off-site. However, the Government's position, as set forth in the indictment and as advanced at trial, is that evidence of whether and when the Defendant was present at NSA is relevant to the question of whether she was working as program manager because some of the work on the Ironbridge contract concerned classified matters that could not be done off-site. ***To the extent that you find that in a given month the Defendant did work off-site*** in performance of the duties of program manager, ***you may take those hours into account in determining whether there was a material difference*** between the number of hours the Defendant actually worked as program manager in that month and the number of hours that InfoTeK billed NSA for Defendant's work that month, as set forth in each of the individual counts of the indictment charging her with violations of the False Claims Act.

JA3097-3098 ("Off-Site Instruction").

Far from clarifying the issue, that instruction turned the burden of proof on its head, telling the jury that without affirmative evidence that McComber was actually working during the hours she billed off-site, they should *not* assume she was actually working (and therefore innocent). The Off-Site Instruction created a rebuttable presumption of guilt, *i.e.*, that McComber was *not* working during off-site hours. Coupled with the government's deliberate omission of evidence of McComber working off-site in its spreadsheet, *see* p.11, *supra*, the instruction improperly shifted the burden of proof to McComber in violation of her due-process rights.

## C. The District Court's Error Was Plain

A district court's error is "plain" if "the settled law of the Supreme Court or this circuit establishes that an error has occurred." *United States v. Reid*, 523 F.3d 310, 316 (4th Cir. 2008). The presumption of innocence is a "bedrock[,] 'axiomatic and elementary' principle" that forbids a finding of guilt "except upon proof beyond a reasonable doubt of *every fact necessary* to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 363-64. "A presumption which, although not conclusive, had the effect of shifting the burden of persuasion to the defendant" is thus constitutionally infirm. *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979). The Off-Site Instruction had the effect of shifting the burden to McComber, constituting plain error.

## D. The Error Affected McComber's Substantial Rights

To establish that an error affected a defendant's substantial rights, the defendant must show "the outcome of [the] trial was actually affected by the error." *Hastings*, 134 F.3d at 240 (cleaned up).

The government built its case upon the premise that if McComber was off-site, she was not working—while relying on a spreadsheet that omitted evidence of her working off-site. *See* p.11, *supra.* And, because 90% of McComber's invoices accounted for off-site time, the government could simply rely on the presumption that she was not working while off-site to prove its case.

In short, the jury could not have convicted McComber based on the evidence at trial *unless* it shifted the burden pursuant to the Off-Site Instruction. The Court cannot find that the proceedings resulted in a fair and reliable determination of guilt as the jury instruction "seriously affected the fairness, integrity, [and] public reputation of the judicial proceedings." *United States v. Pitt*, 482 F. App'x 787, 793 (4th Cir. 2012) (noticing plain error in jury instruction, reversing conviction). Allowing a conviction to stand in light of the government's misleading evidence and persistent burden-shifting presentation, compounded by the court's burden-shifting jury instruction, would be a clear Due Process violation and "would be nothing less than a miscarriage of justice." *Id.* (cleaned up).

## IV. The Government Committed Prejudicial Prosecutorial Misconduct by Making Burden-Shifting Arguments and Appealing to the Jurors' Pecuniary Interests

McComber's conviction must be vacated due to the numerous instances of prosecutorial misconduct that prejudiced her right to a fair trial.

The government committed prosecutorial misconduct in at least two ways. First, the government's cross-examination of McComber and comments in its closing improperly shifted the burden of proof to McComber. Second, the government emphasized that any loss from McComber's alleged conduct harmed the jurors directly as taxpayers. Each of these independently prejudiced McComber and were doubly prejudicial together.

## A. Standard of Review

The Court reviews de novo whether government conduct violated a defendant's due-process rights. *United States v. Shealey*, 641 F.3d 627, 633 (4th Cir. 2011). Specifically, a conviction must be vacated based on prosecutorial misconduct when: "(1) the prosecutor's remarks and conduct [were] in fact ... improper, and (2) such remarks or conduct ... prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Golding*, 168 F.3d 700, 701 (4th Cir. 1999).

## B. The Government Repeatedly Shifted the Burden of Proof to McComber

The fundamental right of innocent-until-proven guilty means that "a defendant does not have to disprove anything nor prove innocence." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). To protect this right, "[i]t is well established that prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." *United States v. Saint Louis*, 889 F.3d 145, 156 (4th Cir. 2018).

For example, it is improper for a prosecutor to suggest to the jury that the defendant is required to explain why the defendant's conduct was innocent, as opposed to the government being required to explain why the defendant's conduct was criminal. *See United States v. Smith*, 500 F.2d 293, 295-97 (6th Cir. 1974) (remanding for new trial because prosecutor's

comment that defendants should "satisfy [the jury] that there is no [non-criminal] reasonable explanation" for the evidence presented "tended to overthrow the presumption of innocence" (cleaned up)). Similarly, it is improper for a prosecutor to imply that the defendant could have called other witnesses or introduced other evidence to prove innocence. *United States v. True*, 179 F.3d 1087, 1090 (8th Cir. 1999) (prosecutor's comment during closing arguments that defendant failed to subpoena a relevant witness was "highly improper"). At bottom, prosecutors "must avoid ... invit[ing] the jury to 'presume' in the absence of countervailing evidence that the government's view of the case is correct, ... or suggest[ing] that the defendant has any burden of proof or any obligation to adduce any evidence whatever." *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990). The government repeatedly flouted those fundamental principles here.

1.    The government asked multiple questions of McComber during cross-examination designed to highlight all of the evidence McComber had *not* introduced during her defense. For example, the government asked McComber:

- "I was just asking you if you had shown any records to the jury demonstrating that you were providing these status reports and you ... didn't, correct?" JA2628-2629.

- "And when you said ['I have to go back to my own calendar'], **you didn't mention any better sources for determining what you**

**were doing that day, correct?** You just referenced the calendars?" JA2656.

- Q. **Have you called in this case a single witness who has come into this court and testified that they observed you working** as the program manager on the Ironbridge contract for an extended period of time?

  - A. No. And you haven't called any that were with me while I was working on the Ironbridge contract not at NSA.

  - Q. So how many people were on the Ironbridge contract team?

  - A. Fifteen.

  - Q. **And you're saying none of them can testify about what you did as the program manager on the Ironbridge contract accurately?**

  - A. All of them testified that they don't know what a program manager does.

    ...

  - Q. So your testimony is that you regularly worked far more than eight hours a day on the Ironbridge contract, but **there's no witness available to confirm what you're saying because you did it privately, correct?**

  - A. I did not say that.

  - Q. Okay. **So who is available who can explain to this jury that you were regularly working 14 hours a day on the Ironbridge contract? Who can say that?"**

JA2671-2672.

In yet another exchange, the government asked McComber whether she provided NSA-OIG with her calendar so they could determine whether

she did billable work on certain days. JA2653-2654. When McComber testified that she turned her calendars over in response to a subpoena, the government asked, "Do you think it would have been helpful to volunteer it to them? … Did you think that your calendars would help to resolve [Hazenstab's] concerns about your billing activity? … And you never bothered to explain them, correct?" JA2653-2655.

These questions obviously implied that if McComber had proof that she was working off-site, she would have introduced it and explained how it proved her innocence. So the jury was to assume that the absence of evidence meant she was not in fact working off-site. Of course, the burden was on the *government* to prove the invoices were materially false, not on McComber to prove they were accurate. *United States v. Elfenbein*, 708 F. Supp. 3d 621, 660 (D. Md. 2023). Yet, the questions communicated to the jury that McComber bore the burden of proving her innocence.

2.    The government sealed its attempt to shift the burden of proof to McComber when it made these three statements during closing arguments:

- "As I said, you do not need to determine the exact number of hours the Defendant worked for each month. Thanks to the Defendant herself **and her failure to even make a pretense at tracking how much time she was billing**, that task would be impossible." JA2978-2979.

- "**What does that tell you if as part of your defense case, rather than bringing in all of the other witnesses you might conceivably have brought in**, you bring in [a 'very junior' NSA contractor] to testify about something that happened nine months after the indictment was returned, eight or nine months after InfoTeK was suspended from government contract." JA3057-3058.

- "**There is no evidence that's been presented in this case, and the defense had the chance to present whatever evidence they wanted to, it was suggested at some time**, oh, well, the Defendant cannot bring in Bobby Kimmel to testify. The defense brought in a bunch of people who were government workers to testify. **The defense has access to subpoenas, trial subpoenas, witness subpoenas to compel the appearance of witnesses just as we do. They can bring in anyone they want. And you can put them up there even as an adverse witness and examine them. That didn't happen.**" JA3051.

These arguments are exactly the type that "invite the jury to 'presume'" that "the government's view of the case is correct" solely due to the absence of countervailing evidence. *Parker*, 903 F.2d at 98. The government's improper questions and closing remarks were not in direct response to anything the defense argued and thus were not a "justified defensive response to a comment by [defendant's] own counsel to the jury." *United States v. Molovinsky*, 688 F.2d 243, 247 (4th Cir. 1982).

The district court found that, because McComber presented a defense *and* testified, the government was permitted to comment on witnesses McComber did not call, and there was no burden-shifting issue. JA2960. In support, the court relied on *United States v. Stockton*, 349 F.3d 755 (4th Cir. 2003). *See* JA2957. But *Stockton* is not a burden-shifting case, and

does not sanction the government's misconduct here. In relevant part, *Stockton* held that the government's comment that the defense chose not to call a witness "could not have implicated [the defendant's] right to remain silent" because the defendant in fact testified. 349 F.3d at 763.

But the issue here is not whether McComber's right to remain silent was violated. Rather, it's whether the government's repeated questions and closing-argument statements inviting the jury to infer McComber's guilt based on the absence of defense evidence unconstitutionally shifted the burden of proof.

## C. The Government's Burden-Shifting Questions and Arguments Prejudiced McComber and Deprived Her of a Fair Trial

The prosecutorial misconduct is particularly egregious here because it violated McComber's constitutional right to be considered innocent until *proven* guilty. Because the government's misconduct prejudiced McComber and deprived her of a fair trial, her conviction must be vacated.

This Court considers various factors when assessing prejudice, namely: "(1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert

attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury." *United States v. Scheetz*, 293 F.3d 175, 186 (4th Cir. 2002). These factors overwhelmingly support only one conclusion: the government's improper burden-shifting arguments prejudiced McComber.

***Misleading the jury.*** The government's burden-shifting questions and arguments misled the jury because they implied that McComber had to prove the Ironbridge invoices were accurate, as opposed to the government bearing the burden of showing they were false. This repeated misstatement of law especially misled the jury because it came from an Assistant United States Attorney, whose "improper insinuations or suggestions are apt to carry more weight against a defendant than such statements by witnesses." *United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991).

***Extensive remarks.*** Even a single remark from the prosecutor that shifts the burden to the defendant can "overthrow the presumption of innocence" and deprive a defendant of a fair trial. *Smith*, 500 F.2d at 297. But it is even worse here, because the government's misconduct was not isolated. The government *repeatedly* asked McComber burden-shifting questions and made *three* separate comments at closing. When a "prosecutor's [improper] comments [are] not limited to one phase of the trial,"

but instead are made during both counsel arguments and witness examination, "the cumulative effect of the statements substantially impair[s]" the defendant's opportunity for a fair trial. *United States v. Conrad*, 320 F.3d 851, 855-58 (8th Cir. 2003); *Berger v. United States*, 295 U.S. 78, 89 (1935) (similar).

***Insufficiency of the evidence.*** Although an isolated improper remark from a prosecutor may not be prejudicial when there is "overwhelming" evidence of the defendant's guilt, *Scheetz*, 293 F.3d at 186, the comments here were neither isolated nor the evidence overwhelming. This was a close case. The jury deliberations spanned three days. *See* JA3116, 4786. The government's primary evidence was a spreadsheet that was unreliable for the reasons explained above. And fundamentally, McComber would not have been convicted unless the jury found that McComber failed to affirmatively prove the invoices were accurate, considering that the government failed to prove their falsity with sufficient evidence.

***Uninvited remarks.*** Defense counsel engaged in no improper conduct that invited the government's burden-shifting arguments. Instead, the government made these improper remarks on the offensive. For example, there is no conceivable basis to ask the jury, "What does that tell you if as part of your defense case, rather than bringing in all of the other witnesses you might conceivably have brought in, you bring in [a 'very junior'

NSA contractor]" besides a bald invitation to presume guilt based on any lack of defense evidence. JA3057-3058. There was no "tit-for-tat" basis justifying the government's conduct. *Beam v. Foltz*, 832 F.2d 1401, 1413-14 (6th Cir. 1987).

***Insufficient curative instructions.*** Finally, rather than curing the government's misconduct, the jury instructions *exacerbated* the problem.

To be sure, jury instructions can eliminate prejudice. *United States v. Benson*, 957 F.3d 235 (4th Cir. 2020). But general instructions that the government bears the burden of proof are not necessarily sufficient on their own. *Sandstrom*, 442 U.S. at 518; *United States v. Canty*, 37 F.4th 775, 793 (1st Cir. 2022) (same). And in some cases, "[a]n error may be so prejudicial that *no* cautionary instruction can safely eradicate its effect." *Smith*, 500 F.2d at 297. The cumulative nature of the misconduct here makes this such a case.

The district court's general instructions that the government bore the burden of proof were insufficient to eliminate prejudice. The government's improper comments did not use the word "burden." And because the court gave no contemporaneous instructions to the jury after these questions and comments were made, by the time of jury instructions, the jurors likely did not connect the government's request to infer guilt based on the absence of defense evidence with the court's general "burden" instructions.

The time lapse was especially damaging as to the extensive cross-examination questions, which occurred *six days* before jury instructions. *Compare*, JA2514 (Feb. 7, 2023, cross-examination), *with* (Feb. 13, 2023, jury instructions). In any event, the severity of the burden-shifting misconduct here was so prejudicial that it's unlikely *any* cautionary instruction saved until the end of trial could have eradicated its effect. The government's burden-shifting misconduct requires vacatur.

### D.  The Government Improperly Appealed to the Pecuniary Interest of the Jurors

On top of the improper burden-shifting, the government also improperly encouraged the jurors to view McComber's alleged crimes as illegally drawing from taxpayer pockets and to put themselves in the government's shoes as a victim.

"[A]ppeals to the pecuniary interests of jurors are patently improper." *United States v. Blecker*, 657 F.2d 629, 636 (4th Cir. 1981). This is a long-established, widespread rule. *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2007) (collecting cases); *United States v. Schimmel*, 943 F.2d 802, 806 (7th Cir. 1991) (same). Specifically, statements that encourage jurors to view overbilling the government as a direct harm to them as taxpayers are "unprofessional and highly improper" in criminal cases. *United States v. Smyth*, 556 F.2d 1179, 1185 (5th Cir. 1977).

In a similar vein, arguments that ask jurors to put themselves in the position of either party—so-called "golden rule" arguments—are generally improper. *Leathers v. Gen. Motors Corp.*, 546 F.2d 1083, 1087 (4th Cir. 1976) (remanding for new trial where counsel asked the jury: "[H]ow much dollars would [limitations on the enjoyment of life] be worth to you, $30 a day, $20, $300 a month?"); *Palma*, 473 F.3d at 902 (golden-rule arguments are "universally condemned because [they] encourage[] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence" (cleaned up)).

Here, during closing arguments, the government encouraged the jurors to think about McComber's allegedly unlawful billing in terms of their own taxpayer dollars. First, when explaining how the jury would determine whether an instance of overbilling was material, the government stated: "[A]sk yourself, **would that difference in the number of hours at about $150 an hour or about $2.50 a minute make a difference to you**? That's materiality." JA2965. Then, when listing dates McComber was off-site, the government argued, "That's the third straight day she's away from NSA, each day she billed eight hours. **That's about $3,600 in tax payer funds for those days**." JA2980.

The first remark, which referred to *an element of the offense* (materiality), directed jurors to put themselves in the government's shoes, in violation of the golden rule. Asking the jury to consider how much money would "make a difference to [them]" in order to determine materiality is precisely what this Court found improper in *Leathers*, where the prosecutor asked the jurors to consider "how [many] dollars would [the alleged harm] be worth to [them]." 546 F.2d at 1087.

Even worse here, the government went on to argue that three days of alleged overbilling equaled "about $3,600 *in tax payer funds*." JA2980. The reference to "tax payer funds" could have been for no other purpose than to suggest to the jury that McComber's alleged conduct harmed them directly as taxpayers. The government's statements that the jurors should consider how much overbilled money would "make a difference to [them]," followed by emphasizing that any loss was to "tax payer funds," was "patently improper." *Blecker*, 657 F.2d at 636.

## E. The Government's Appeals to Jurors' Pecuniary Interests Prejudiced McComber

These statements prejudiced McComber and are an independent basis to vacate McComber's conviction.

This is not a case where the prosecution's statements were ambiguous or where the court made a curative instruction. *Id.*; *Smyth*, 556 F.2d at 1185. And, as explained *supra*, p.68, this was a close case. The Court in

*Blecker* was willing to overlook a potential appeal to the pecuniary interests of jurors in part because it was not facing a close case, and there was more than sufficient evidence of guilt. 657 F.2d at 636. But close cases are different. *Buttermore v. United States*, 180 F.2d 853, 856 (6th Cir. 1950) (finding appeal to jury as taxpayers did not cause prejudice but acknowledging, "[i]f the case against appellant had been a weak one[,] another course might have been justified"). Here, appeals to jurors' interests as taxpayers were significantly more prejudicial than in *Blecker* and no jury instruction cured the error. McComber was thus deprived of a fair trial and her conviction should be vacated.

## F. The Repeated Instances of Prosecutorial Misconduct Had the Cumulative Effect of Depriving McComber of a Fair Trial

The litany of burden-shifting questions and comments from the government, on top of its appeals to the jury's pecuniary interests, cumulatively caused prejudicial harm to McComber, compelling vacatur.

Under the cumulative-error doctrine, "the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002) (cleaned up). This Court will vacate a conviction when errors "so fatally infect[ed] the trial that they violated

the trial's fundamental fairness." *United States v. Lighty*, 616 F.3d 321, 371 (4th Cir. 2010) (cleaned up).

Both types of prosecutorial misconduct above are sufficient on their own to vacate McComber's sentence. But together, the prejudice is two-fold. Not only was the jury effectively told that McComber needed to prove the invoices were accurate instead of the government needing to prove they were false, but the jury was also encouraged to think about how a false invoice affected them directly as taxpayers. The repeated instances of misconduct, which occurred over multiple days and via numerous remarks by prosecutors on top of a prejudicial jury instruction, in a close case no less, resulted in McComber being deprived of a fair trial, and thus require vacatur.

## V. The Court's Restitution Order Must be Reversed Because the NSA Suffered No Pecuniary Loss and the Order is Based on an Arbitrary Loss Determination

The district court's $176,913 restitution order is tainted by both legal and factual errors. Because NSA suffered no pecuniary loss, and instead got the full benefit of its bargain, the restitution order should be reversed.

### A. Standard of Review

In the sentencing context, this Court reviews findings of fact for clear error and questions of statutory construction de novo. *United States v. Moore,* 666 F.3d 313, 320 (4th Cir. 2012). The Court reviews a district

court's restitution order for abuse of discretion. *United States v. Ocasio*, 750 F.3d 399, 412 (4th Cir. 2014). "A district court abuses its discretion when it (1) acts arbitrarily, as if neither by rule nor discretion, (2) fails to adequately take into account judicially recognized factors constraining its exercise of discretion, or (3) rests its decision on erroneous factual or legal premises." *United States v. Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016) (cleaned up).

## B. The District Court Erred in Refusing to Apply Credits Against Loss

The Mandatory Victims Restitution Act ("MVRA") requires a defendant to "make restitution to the victim of the offense" upon conviction for "any offense ... committed by fraud or deceit." 18 U.S.C. 3663A(a)(1), 3663A(c)(1)(A)(ii). The MVRA is designed to promote a "compensatory goal" by making the victim of the offense whole. *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017). Because the MVRA's primary goal is compensatory, it "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole." *Id.* As a result, "[a] court may base its restitution order on *actual* losses only, not intended losses." *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017).

The Sentencing Guidelines provide a framework for calculating the amount of loss attributable to a defendant. It defines actual loss as "the

reasonably foreseeable pecuniary harm that resulted from the offense," USSG §2B1.1(C)(i), and provides that the "calculation [of actual loss] must take into account (and deduct) pecuniary value the victim(s) gained by way of the defendant's conduct," *United States v. Allen*, 529 F.3d 390, 397 (7th Cir. 2008).

"[T]he sole question under section 2B1.1(b)(1) is whether the defendant's fraudulent conduct resulted in *pecuniary* loss warranting a further increase in [her] base offense level." *United States v. Crummy*, 249 F. Supp. 3d 475, 485 (D.D.C. 2017). In the government contracts context specifically, "the loss amount should [] reflect ... the contract price less the fair market value of services rendered." *United States v. Harris*, 821 F.3d 589, 605 (5th Cir. 2016); §2B1.1 cmt. n.3(E)(i) ("[The sentencing court must credit] the fair market value of the property returned and the services rendered, by the defendant ... to the victim before the offense was detected."). Damage to programmatic interests, alone, should not count as pecuniary harm. *Crummy*, 249 F. Supp. 3d at 483-84.

Applying this "credits-against-loss" rule here confirms there was no pecuniary loss. The NSA-OIG received the whistleblower letter on August 30, 2017. JA541. So the value of the work McComber performed from March 16, 2016, when she began work as full-time Ironbridge PM, to—at a minimum—August 30, 2017, must be credited toward any loss amount.

That NSA received the value of the time McComber billed during that time is evident from the clear terms of the Contract and the undisputedly excellent performance of Ironbridge under McComber's management.

As an FFP-LOE contract, Ironbridge **required** ITK to provide a full-time-equivalent ("FTE") PM throughout the Indictment Period. JA4449-4605; *see also* JA6504-6505. The pro-rata hours for FTE PM work over nineteen months, at 1880 hours per year, was 2,976 hours. The hourly pay for the Ironbridge PM during the Indictment Period was $150.35. At $150.35 x 2,976 hours, the government thus assigned a value of $447,441.60 to the full-time Ironbridge PM position for the nineteen-month period. The amount the government says it paid for PM hours during that time-period was $387,375.29.

Not only was the amount actually charged lower than the assigned value, but it is undisputed that all services and tasks ordered by NSA through the Contract were received to full satisfaction. JA5768. NSA thus got exactly what it paid for and there was no pecuniary loss. And that is true even if the government's allegations about the hours McComber billed were accurate. As the victim impact statement submitted by NSA makes clear, the only measurable harm in this case is to programmatic interests. JA6684. And such harms cannot form the basis of a restitution order.

The district court was "not persuaded" by this credits-against-loss argument. JA7173. The court reasoned that an FFP-LOE contract "is not a license for a contractor to bill for the hours that are allocated if the government's estimate was wrong or the work is not actually performed." *Id.*; JA6734 ("[The allocated hours is] an estimate."). That conclusion is legally and factually inaccurate.

*First*, the obligated hours under an FFP-LOE contract is *not an estimate*. The government commits to paying a fixed price for a specified level of effort. As the Comptroller General recently explained in a bid-protest decision finding a purported FFP-LOE contract was "ambiguous and d[id] not comply with applicable regulatory requirements," labor hours "set out in the solicitation cannot, simultaneously, be a fixed level of effort that the successful offeror will be obligated to perform, and at the same time, [be] an estimated 'ceiling' number of hours to be used only for proposal purposes and workload planning." *Matter of: Gen. Dynamics Info. Tech., Inc.*, B-421525 (May 26, 2023).

*Second*, it is undisputed that the work was "actually performed." As the district court remarked at sentencing: "There is no question that the work, the substantive work was done and to the satisfaction of the Government." JA6737. It is thus inconceivable that NSA suffered a pecuniary loss.

## C. The District Court's Loss Calculation was Arbitrary and Unsupported by the Evidence

1. The court's restitution order should also be vacated because its loss determination was arbitrary and not supported by the evidence. Under 18 U.S.C. 3664(e), any dispute as to the proper restitution amount must be resolved by the district court by a preponderance of evidence, and the government bears the burden of proof. *Stone*, 866 F.3d at 225. This Court will reverse under the clear-error standard if, "on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed." *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012) (cleaned up). Although this standard "is deferential, it is not toothless." *Id.* at 452 (cleaned up).

Although the "court need only make a 'reasonable estimate of loss, given the available information,'" *United States v. Savage*, 885 F.3d 212, 227 (4th Cir. 2018), "an estimate that is unsupported by any evidence cannot be reasonable," *United States v. Catone*, 769 F.3d 866, 877 (4th Cir. 2014). The actual loss amount should be based on "a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss." *United States v. Martin*, 796 F.3d 1101, 1110 (9th Cir. 2015) (cleaned up).

Here, for the court's restitution order to stand, the record must contain at least some evidence supporting its finding that McComber is entitled to credit for only 60 hours of off-site time a month, resulting in a loss amount of $176,913. It does not. By the court's own telling, that calculation was a "guess" lacking "justification." JA7098. A court cannot "arbitrar[il]y" pick a loss figure. *United States v. Grant*, 211 F. App'x 889, 896-97 (11th Cir. 2006) (vacating loss determination where court randomly picked a number and, "in a burst of candor, ... stated its recognition that the $50,000 figure 'may sound arbitrary'"). To do so is "an abuse of discretion and contrary to law." *Id.* at 897-98.

As explained in McComber's Objections to the Government's Proposed Guidelines Enhancements and Presentence Report, JA6019-6058, the government offered no facts evincing how—despite the fact that the clear terms of the Ironbridge FFP-LOE contract required a set number of hours from McComber as PM, the Contract was by all accounts high performing, and a mountain of evidence showed McComber doing work off-site—the government had suffered any actual loss. Such an unsupported loss figure is patently insufficient to satisfy the government's "burden of demonstrating the amount of loss" for purposes of restitution. *United States v. Steele*, 897 F.3d 606, 614 (4th Cir. 2018).

The court agreed that the government's loss estimate was not reasonable, JA7097-7098, but its alternative figure was no better. The court "rest[ed] its decision on [multiple] erroneous factual ... premises." *Alvarado*, 840 F.3d at 189. *First*, for the reasons explained *supra*, pp.42-46, the witness testimony was incapable of supporting loss because they had no opportunity to observe the bulk of the work McComber was doing and had no knowledge of what a PM does. *United States v. Nelson*, 774 F.3d 1104, 1107 (7th Cir. 2014) ("A defendant is entitled to have sentencing determinations made based on reliable evidence rather than speculation or unfounded allegations.").

*Second*, the court erroneously relied on the hours McComber billed as Ironbridge PM *four years* before the Indictment Period, when the position was part-time. The Contract was later modified, JA2486-2487, and McComber was obligated under the terms of the Contract during the Indictment Period to work full-time. The court also neglected that McComber's immediate predecessor, Colston, was billing hours nearly identical to McComber's. JA3148-3157.

Similarly, in its opinion denying McComber's motion to stay incarceration pending appeal, the district court justified its loss determination on the basis that "a portion of the Contract initially included work for the

[CTMMC]" and "[t]hat work was subsequently removed from the Contract." JA7174. But that organizational change occurred long before McComber took over as Ironbridge PM for the second time in March 2016, JA2476-2478, and the Contract was modified to require a full-time PM for the Indictment Period notwithstanding removal of CTMMC support.

2.    If anything, the government's and the court's loss analyses show loss is impossible to determine here. The government acknowledged that in its closing at trial, *see* JA2978-2979 ("[Y]ou do not need to determine the exact number of hours the Defendant worked for each month[,] … "that task would be impossible."), and again at sentencing, JA6708 ("We are in a situation here where there is virtually no evidence whatsoever as to what the defendant actually did when she was off-site."). The district court also recognized this at sentencing, noting that no matter which percentage the court went with to estimate the amount of off-site time McComber worked, it all seemed arbitrary. JA6728.

In cases like this, where there is no means for reaching a "reasonable approximation," *United States v. Savoie*, 985 F.2d 612, 617 (1st Cir. 1993), a court need not order restitution at all, *see* 18 U.S.C. 3663A(c)(3)(B). The complexity exception was well-warranted here.

## D. The District Court Erred in Calculating the Advisory Guidelines Range

The district court's guidelines calculations suffered from the same flaws as its restitution order. If the court had properly considered the evidence, including credits against loss, the amount of loss would have been zero, resulting in a guidelines range of 0-6 months instead of 21-27 months. That alone is basis to vacate McComber's sentence. *Rosales-Mireles v. United States*, 585 U.S. 129, 140-145 (2018).

## CONCLUSION

For the foregoing reasons, this Court should reverse the conviction or, alternatively, remand for resentencing.

Respectfully submitted,

*/s/ Andrew S. Tulumello*

| | |
|---|---|
| Paresh S. Patel | Andrew S. Tulumello |
| OFFICE OF THE FEDERAL PUBLIC DEFENDER | Crystal L. Weeks |
| | Laurel L. Zigerelli |
| 6411 Ivy Lane, Suite 710 | WEIL, GOTSHAL & MANGES LLP |
| Greenbelt, MD 20770 | 2001 M Street NW, Suite 600 |
| (301) 344-0600 | Washington, DC 20036 |
| | (202) 682-7516 |
| | Drew.tulumello@weil.com |

Alli G. Katzen
Marina Masterson
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Ave., Suite 1200
Miami, FL 33131
(305) 577-3150

December 30, 2024

## REQUEST FOR ORAL ARGUMENT

Appellant requests oral argument in this appeal from a criminal conviction arising out of a trial. This appeal involves fact-intensive issues. Oral argument will assist the Court in deciding the questions raised on appeal.

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 17,770 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

_/s/ Andrew S. Tulumello_
Andrew S. Tulumello

December 30, 2024

# CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2024, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants. A copy of Joint Appendix Volume XVI (Sealed) was sent via overnight delivery to:

Jefferson M. Gray
OFFICE OF THE U.S. ATTORNEY
36 South Charles Street 4th Floor
Baltimore, Maryland 21201

/s/ Andrew S. Tulumello
Andrew S. Tulumello

December 30, 2024